## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **RICHARD J. MCCLINTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:20-cv-543-AMM** |
| | ) | |
| **COGENCY GLOBAL, INC.,** | ) | |
| **d/b/a CAPSTONE LOGISTICS,** | ) | |
| **LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>ORDER</u>

This case is before the court on a motion to amend by Plaintiff Richard McClinton, Doc. 82, and a motion for summary judgment and a second motion to strike by Defendant Capstone Logistics, LLC ("Capstone"), Docs. 65, 85. For the reasons stated below, the motion for summary judgment is **DENIED**. Doc. 65. The motion to amend and the motion to strike the second amended brief in opposition are **DENIED**. Docs. 82, 85. However, a hearing will be set to determine (1) whether and to what extent sanctions are appropriate to address Mr. McClinton's counsel's violation of the court's July 15, 2022 order, Doc. 81, and (2) whether and to what extent sanctions are appropriate to address Capstone's counsel's material misrepresentation of fact, discussed *infra* pp. 6-7.

## I. BACKGROUND

These are the undisputed material facts construed in the light most favorable to Mr. McClinton, and those disputed by Capstone but construed against it for purposes of its summary judgment motion:

Capstone's employees unloaded trucks at a Dollar General warehouse in Bessemer, Alabama. Doc. 66 ¶ 3; *see* Doc. 84. In July of 2017, Mr. McClinton began working for Capstone as a supervisor. Doc. 32 ¶ 9; Doc. 36 ¶ 9. Mr. McClinton reported to Donald Langley, a site manager. Doc. 64-1 at 12-13.

In February of 2019, Mr. McClinton planned to have back surgery. *Id*. at 41. Mr. McClinton's "back issues" had caused him to walk with a "visible" limp. *Id*. at 59. Mr. McClinton told Manager Langley about his surgery about "a week beforehand." *Id*. at 43. During that conversation, neither Mr. McClinton nor Manager Langley mentioned the Family Medical Leave Act ("FMLA"). *Id*. Mr. McClinton did not "know anything about" FMLA leave. *Id*. at 47.

Mr. McClinton underwent back surgery on February 25, 2019, took a month off from work, and returned to work on March 25, 2019. *Id*. at 41. Mr. McClinton was paid his full salary while he was off that month. *Id*. at 48.

Mr. McClinton's neurosurgeon (Dr. Chambers) completed Capstone's "Fit For Duty Release (Unloader)" form for Mr. McClinton. Doc. 64-1 at 41-42, 51; *see id.* at 239. Mr. McClinton's neurosurgeon checked several boxes on the form to

indicate "physical job requirements" that Mr. McClinton could not "perform without restriction." *Id*. at 239 (emphasis omitted). Mr. McClinton gave Manager Langley the completed form when he returned to work on March 25, 2019. *Id*. at 42.

"Before [Mr. McClinton] went out for back surgery," Capstone's "second shift" was his "regular . . . shift." *Id*. at 38. When Mr. McClinton returned to work on March 25, 2019, Manager Langley told him that he needed to also work weekends, so Mr. McClinton worked the "second shift plus weekend shifts." *Id*. Manager Langley did not tell Mr. McClinton why he had to work weekend shifts. *Id*.

Mr. McClinton worked "six days a week," and for a while "everything [was] fine." *Id*. at 49. But "two weeks or so after [the] surgery," Mr. McClinton asked Manager Langley "if [they] could realign the schedule so [he] wouldn't have to work all weekend . . . because [he] [had] just come off of surgery." *Id*. at 50. The extra shifts "put a lot of strain on" Mr. McClinton, and he was "hurt," which "slowed [him] down." *Id*. at 38. Manager Langley responded: "[Y]ou can work . . . or quit." *Id*. at 50.

"[A]round April 15, 2019, [Mr. McClinton] woke up with severe back and leg pain, went to the E[mergency ]R[oom], and called in sick to work with a doctor's excuse." *Id*. at 49. "[B]efore going into work on" April 18, 2019, Mr. McClinton called Manager Langley and asked if he could use "some crutches" or "a walking

stick or something" to "help [him] . . . make it around." *Id*. at 49. Manager Langley told him no, and that Mr. McClinton was needed at work. *Id*. at 49.

On Wednesday, April 17, 2019, Manager Langley sent an email to Sally Matteson (who was in Capstone's Human Resources Department). Doc. 64-2 at 27-28, 36 (discussing document stamped Capstone00143); *id*. at 245. In that email, Manager Langley wrote that Mr. McClinton had "returned to the doctor" that week; that Mr. McClinton "would require crutches" upon returning to work; and that "[o]ur work conditions do[] not create an opportunity for him to return to work under those conditions." *Id*. at 245. Several minutes later, Manager Langley wrote to Jose Fernandez (a vice president of Capstone): "I have . . . some documented conversations in regards to [Mr. McClinton] and his performance that I will forward to you." *Id*. at 16, 27, 65, 243. The emails Manager Langley forwarded were ones that he had sent to himself several months before. *Id*. at 243, 248-49.

When Mr. McClinton arrived to work on the evening of Thursday, April 18, 2019, he informed Manager Langley that there "was a good possibility" that he may undergo additional surgery, but that he "wouldn't know until [his] follow-up visit" on April 30, 2019. Doc. 64-1 at 51. Mr. McClinton gave Manager Langley a "Work Release" signed by a UAB Emergency Department physician. *Id*. at 49, 251. That work release contained two fields: a "[r]eturn to work" field and a "[l]imitations" field. *Id*. at 251. The limitations field was blank. *Id*. According to Mr. McClinton,

4

the work release's blank limitations field did not mean that he was "cleared to return to work . . . with no restrictions" by the Emergency Department physician who signed the work release, because the work release was "not meant to super[s]ede [his] neurosurgeon's . . . recommendations." *Id*. at 49. Manager Langley testified that Mr. McClinton also gave him a note stating that Mr. McClinton was seen at the "Spine Net" clinic on April 17, 2019, and to "[p]lease excuse him from work" for that day. Doc. 64-2 at 73, 189.

After the conversation about the possibility that Mr. McClinton would have to undergo additional surgery, Mr. McClinton "started setting up" for his Thursday evening shift. Doc. 64-1 at 51. About twenty minutes later, Manager Langley "called [Mr. McClinton] over" and gave him a Corrective Action Notice that had been completed on a computer and printed. *Id*. at 32, 51.

The Corrective Action Notice stated that Mr. McClinton "was the supervisor on [a] shift that allowed employees to work under unsafe conditions," that "[p]revious expectations have been provided as well as other conversations in regards to these concerns," and that "[f]ailure to make these improvements will result in further disciplinary action up to and including termination." *Id*. at 229.[1]

---

[1] Mr. McClinton testified that Manager Langley and Dollar General were responsible for the alleged unsafe conditions (if they ever existed), that the alleged previous conversations did not occur, and that when he disputed the charges, Manager Langley told him to sign the Corrective Action Notice anyway. *Id*. at 30, 33-34. For the reasons discussed *infra* p. 19, the dispute about prior misconduct and discipline is immaterial to resolution of Capstone's motion for summary judgment.

There were computer-generated X's in boxes indicating that the "Action Taken" was a "Written" warning (as opposed to a "Verbal" warning or a "Suspension") and that the "Next Action To Be Taken" was "Termination" (as opposed to a "Written Warning," a "Suspension," or "Other"). *Id.* at 229; *see id.* at 32, 36.

Before Mr. McClinton and Manager Langley signed the Corrective Action Notice, they agreed to make two changes: the Corrective Action Notice would be a "Verbal" warning, and "Suspension" would be the "Next Action To Be Taken." *Id.* at 31-33, 36-37. Mr. McClinton "started . . . mark[ing] out" the computer-generated X's and marking the boxes upon which they had agreed, but Manager Langley said: "No, wait," *id.* at 32, or "No, let me," *id.* at 36. Manager Langley told Mr. McClinton that as the site manager, Manager Langley should be the one to make the changes. *Id.* at 32. Specifically, Mr. McClinton had "started to mark" the box for "Suspension" and Manager Langley "finished marking it," or "marked it again." *Id.* at 36-37. Two X's appear in the box for "Suspension." *See* Doc. 64-2 at 210. Manager Langley then signed the Corrective Action Notice and gave it back to Mr. McClinton, who also signed it. Doc. 64-1 at 32.

The court pauses the factual recitation here to describe a material misstatement in Capstone's brief. Despite Mr. McClinton's testimony, Capstone's counsel represented to the court that it was "undisputed for purposes of [its summary judgment] motion" that "[t]he next morning, April 19, 2019, a Friday, Langley

6

discovered that McClinton had doctored the Corrective Action Notice . . . ." Doc. 66 at 5, 18. One of the central disputes of the case is whether Manager Langley "discovered that McClinton had doctored the Corrective Action Notice," *id.* at 18, or amended it together with Mr. McClinton, Doc. 84 at 10. At the upcoming hearing, Capstone's counsel should be prepared to explain why this misrepresentation does not violate their duty of candor to the court and Federal Rule of Civil Procedure 11(b)(3).

Manager Langley testified that he "[a]bsolutely" did not agree to amend the Corrective Action Notice or alter it himself. Doc. 64-2 at 71. Manager Langley testified that he "discovered" the alterations the next day and thought: "oh, my[,] he's changed the document." *Id.* at 75.

In any event, Manager Langley and Mr. McClinton signed the Corrective Action Notice on the Thursday before Easter, which was April 18, 2019. Doc. 64-1 at 31, 35, 38. Mr. Fernandez, Capstone's corporate representative, testified that Manager Langley contacted Mr. Fernandez on Friday, April 19, 2019, and "stated [Manager Langley's] desire to terminate Mr. McClinton." Doc. 64-5 at 8. Mr. Fernandez "instructed [Manager Langley] to confer with" a Human Resources Coordinator, Jermaine Bunch. *Id.* Manager Langley testified that on that Friday, he and Mr. Bunch decided to terminate Mr. McClinton's employment for falsifying the Corrective Action Notice. Doc. 64-2 at 76. Mr. Fernandez testified that "falsifying

the [Corrective Action Notice] was the reason [Mr. McClinton] was terminated." Doc. 64-5 at 8.

Mr. McClinton had that Friday, Saturday, and Sunday (Easter weekend) off from work. Doc. 64-1 at 35, 38. On Monday afternoon, before Mr. McClinton's shift started, Manager Langley called him and told him that his employment had been terminated "for falsifying the corrective action notice." *Id*. at 37.

Capstone conceded that Mr. McClinton was forty-three years old when his employment was terminated. *See* Doc. 66 at 31; Doc. 84 at 44. Mr. McClinton conceded that Capstone replaced him with a thirty-five-year-old. *See* Doc. 66 ¶ 44; Doc. 84 ¶ 44; *see* Doc. 64-5 at 31-32 (testifying on behalf of Capstone that Mr. McClinton's "permanent replacement" was in his mid-thirties).

Mr. McClinton filed this action on April 21, 2020. Doc. 1. In his second amended (operative) complaint, Mr. McClinton asserted claims against Capstone in six counts: (1) a disparate treatment claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., challenging the termination of his employment, *see* Doc. 32 ¶ 81; (2) a retaliation claim under the ADA challenging the termination of his employment, *see id.* ¶¶ 123-24; (3) a claim under the ADA challenging Capstone's alleged denial of his request for reasonable accommodations, *see id.* ¶¶ 159-161; (4) a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., challenging the termination of his employment,

*see id.* ¶ 174; (5) an interference claim under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, challenging the termination of his employment, *see id*. ¶¶ 203-05; (6) a retaliation claim under the FMLA challenging the termination of his employment, *see id*. ¶¶ 225-26, 232.

Mr. McClinton's complaint could be construed to assert claims based on other potential adverse actions, *see, e.g., id.* ¶¶ 123-26, 174, but that construction would render the complaint a successive shotgun pleading in violation of a court order, *see* Doc. 14. Accordingly, rather than dismissing counts that potentially assert multiple independent claims, the court has construed the operative complaint in Mr. McClinton's favor to assert only one claim in each count. *See, e.g., Barmapov v. Amuial*, 986 F.3d 1321, 1326 (11th Cir. 2021) (holding that courts confronted with successive shotgun pleadings have discretion to dismiss a case); *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1332 (11th Cir. 1998) (allowing courts encountering shotgun pleadings "to strike from each count the immaterial . . . allegations" and determine "essentially" what kind of claim is being brought).

Capstone moved for summary judgment, Doc. 65, Mr. McClinton filed and amended his opposition brief, Docs. 72, 75, and Capstone filed a reply, Doc. 78. After Mr. McClinton's amended opposition brief was stricken for violating the initial order, *see* Doc. 81, he filed a second amended opposition brief, Doc. 84. Capstone filed a second motion to strike. Doc. 85.

## II. LEGAL STANDARD

A party moving for summary judgment must establish "that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (cleaned up).

"The movant's initial burden consists of a responsibility to inform the court of the basis for its motion and to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (cleaned up). "The nature of this responsibility varies, however, depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or the non-movant would bear the burden of proof at trial." *Id.* If the movant bears the burden of proof at trial, the movant's initial burden is to "show affirmatively" that for each element of its case, no reasonable factfinder could find in the nonmovant's favor. *Id.* (emphasis omitted).

If the nonmovant bears the burden of proof at trial, then the movant's initial burden is not to "negate[]" an element of the nonmovant's case. *Id.* (emphasis omitted). Instead, the movant can satisfy its initial burden by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (cleaned up). To do this, the movant "must point to specific portions of the record in order to demonstrate that the nonmoving party cannot meet its burden of proof at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys.*, 941 F.2d 1428, 1438 n.19 (11th Cir. 1991) (*en banc*). For example, the movant may point to the nonmovant's response to an interrogatory and note that the response fails to identify a basis of proof for an essential element of the nonmovant's case. *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 607 (11th Cir. 1991). "[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id.* at 608.

If the moving party has carried its initial burden, Rule 56 requires the nonmoving party to "go beyond the pleadings" and establish that there is a material fact in genuine dispute. *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c)(1)(A).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249

(1986). "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (cleaned up).

## III. ANALYSIS

### A. Count One: ADA Disparate Treatment

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . . ." *Id.* § 12111(8). "The term 'disability' means . . . a physical . . . impairment that substantially limits one or more major life activities of such individual; . . . a record of such an impairment; or . . . being regarded as having such an impairment." *Id.* § 12102(1).

To prevail on an ADA disparate treatment claim, a plaintiff must prove that: "(1) she [wa]s disabled, (2) she was a 'qualified individual' when she was terminated, and (3) she was discriminated against on account of her disability." *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016).

Capstone asserted that Mr. McClinton cannot establish the disability element of his claim because when he returned to work on April 18, 2019, after his ER visit,

12

he gave Manager Langley a work release from the UAB Emergency Department with a blank "Limitations" field, and a note from the Spine Net clinic requesting that Mr. McClinton be excused from work for a day. Doc. 66 at 25-26; *see* Doc. 64-2 at 188-89. Capstone asserted that those documents are "evidence affirmatively negating" the disability element. *Fitzpatrick*, 2 F.3d at 1116.

Mr. McClinton responded that the work restrictions placed by his neurosurgeon could establish his disability, and that the notes about his ER visit three weeks later did not lift those restrictions—indeed, upon his return from the ER, he requested crutches and told Manager Langley that, depending on an upcoming follow-up with his neurosurgeon, he may undergo a second surgery. Doc. 84 at 13-14, 32-34. A reasonable jury considering all the evidence would not be required to find that Mr. McClinton did not have "a physical . . . impairment that substantially limit[ed] one or more major life activities" or "a record of such an impairment." 42 U.S.C. § 12102(1). Put differently, a reasonable jury could find that Mr. McClinton went to the ER because his condition was worse—not better, that Manager Langley knew that, and that the blank "Limitations" field on the note from the ER was insignificant. Accordingly, Capstone failed to establish that the notes related to Mr. McClinton's ER visit prove that he did not have a disability.

As to the second element of an ADA discrimination claim, Capstone asserted that Mr. McClinton cannot establish that he was a "qualified individual" under the

ADA because he testified "that he could not perform the essential functions of his job in April 2019, irrespective of whether he was permitted to use a walking cane or crutches." Doc. 66 at 27 (citing Doc. 64-1 at 50). Capstone cited Mr. McClinton's testimony that as of April 17, 2019, even with "crutches or a walking stick," he could not "lift up to 50 pounds"; "lift, push, pull, and carry cases up to 80 pounds"; "squat, kneel, bend, or twist for three to six hours in an eight-hour shift"; "handle cases of pallets and load and unload cases of product from pallets"; or "stack cases on pallets." Doc. 64-1 at 50.

Mr. McClinton responded that testimony by Capstone's corporate representative about the essential functions of his job is sufficient to create a jury question whether he was a qualified individual under the ADA. Doc. 84 at 13 (citing Doc. 64-5 at 40). Capstone's corporate representative testified that Mr. McClinton "was . . . able to perform the essential functions" of his job "because the essential function of the supervisor is the oversight of the operation," and that Capstone "accommodate[d]" him vis-à-vis "other functions . . . that [Capstone] like[s] the supervisors to be able to perform." Doc. 64-5 at 40.

On reply, Capstone did not discuss the effect of that testimony by its corporate representative. *See* Doc. 78 at 13-14. A reasonable jury hearing that testimony could find that Mr. McClinton's restricted ability to lift, squat, handle, stack, and perform similar activities did not mean that he, "with or without reasonable accommodation,

14

c[ould] [not] perform the essential functions of the employment position that such individual holds . . . ." 42 U.S.C. § 12111(8).

As to third element of an ADA discrimination claim, a "plaintiff may establish a prima facie case [of discrimination] by showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal under" the ADA. *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 228 (2015) (cleaned up). "The burden of making this showing is not onerous." *Id.* (cleaned up). For example, discriminatory intent has been inferred from "suspicious timing of [a] termination" that closely followed an announcement. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 925-26 (11th Cir. 2018). In *Jefferson*, the plaintiff made a report, his supervisor issued him a negative performance evaluation that same day, and the employer terminated the employee's employment one week later. *Id.* That timing was "circumstantial evidence of a causal connection between the" report and the termination decision. *Id.* at 926.

To raise an inference of discrimination, Mr. McClinton relied on the "suspicious timing" of Manager Langley's emails and his request to terminate Mr. McClinton. Doc. 84 at 46. While Mr. McClinton was out for three days related to his ER visit (April 15-17, 2019), Manager Langley emailed HR and Vice President Fernandez and explained that Mr. McClinton (a) had recently returned to work from

back surgery; (b) had been out for three days and went to the doctor; (c) may require crutches to return to work; and (d) could not "work under those conditions." Doc. 64-2 at 245. Minutes later, Manager Langley emailed Vice President Fernandez private notes that were several months old about Mr. McClinton's performance. *Id.* at 243, 248-49. The next day, twenty minutes after Mr. McClinton returned to work and told Manager Langley that he may need additional surgery, Manager Langley issued him a Corrective Action Notice. The day after that, Manager Langley requested termination of Mr. McClinton's employment. *Id.* at 76-77; Doc. 64-5 at 8.

Capstone did not assert that the timing of Mr. McClinton's disclosures about his alleged disability and the termination of his employment is too attenuated to establish a *prima facie* case of discrimination. *See* Doc. 66. Rather, Capstone asserted that Mr. McClinton cannot establish a *prima facie* case of disability discrimination for two reasons: (1) the notes from his ER visit preclude him from establishing "that Langley, Fernandez, and Bunch had actual knowledge of his alleged disability when they decided to terminate his employment"; and (2) he had "poor performance," "fail[ed] to enforce safety rules," and "doctor[ed] the Corrective Action Notice." Doc. 66 at 28-29.

For many of the reasons already discussed, a reasonable jury could decline to find that Manager Langley and Mr. Bunch (the decisionmakers) interpreted the notes from Mr. McClinton's ER visit the way that Capstone interprets them. Based on Mr.

McClinton's testimony about what he told Manager Langley, a reasonable jury could conclude that Manager Langley knew that Mr. McClinton's condition was worse—not better—after his visit to the ER. *See* Doc. 64-1 at 49. Accordingly, those notes do not establish that the relevant decisionmakers did not know about Mr. McClinton's disability when they decided to terminate his employment.

On reply, Capstone cited other evidence that, according to Capstone, lends context to the timing of Manager Langley's decision to discipline Mr. McClinton and terminate his employment. *See* Doc. 78 at 24-26. In particular, Capstone asserted that Manager Langley witnessed misconduct by Mr. McClinton on April 12, 2019, which was before Mr. McClinton went to the ER. *Id*. at 25. But Manager Langley escalated his concern about that alleged misconduct on April 17 and 18, 2019—only (and immediately) after he learned that Mr. McClinton went to the ER on April 15, 2019, *see* Doc. 64-2 at 27, 166-76—so the timing of that alleged misconduct does not undercut Mr. McClinton's *prima facie* case.

Capstone's second contention—that Mr. McClinton was guilty of misconduct—does not provide a basis to hold that Mr. McClinton cannot make out a *prima facie* case of disability discrimination. To rebut a plaintiff's *prima facie* case of discrimination, an employer "must clearly set forth, through the introduction of admissible evidence, the reasons" on which the decisionmaker actually relied to take the challenged action—it is not enough for the employer to "merely . . . contend[]"

in its brief that a legitimate reason exists. *Increase Minority Participation by Affirmative Change Today of Nw. Fla., Inc. (IMPACT) v. Firestone*, 893 F.2d 1189, 1193 (11th Cir. 1990) (cleaned up); *see also Walker v. Mortham*, 158 F.3d 1177, 1181 & n.8 (11th Cir. 1998).

"If the employer offers an apparently legitimate, non-discriminatory reason for its actions, the plaintiff may in turn show that the employer's proffered reason[] [is] in fact pretextual." *Young*, 575 U.S. at 229 (cleaned up). "[T]he plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (cleaned up). A decisionmaker's "dishonesty about a material fact" is evidence that a reasonable jury could "consider . . . as affirmative evidence of guilt" and may strengthen an inference of discriminatory intent. *Id*. at 147 (cleaned up).

Evidence that suggests merely that reasonable people could **disagree** that the employee ought to have been subjected to the challenged action "does not, without more, create a basis to **disbelieve** an employer's explanation" for taking the action, at least not where that explanation is reasonable. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) (emphasis in original). But if a reasonable jury could find that the decisionmaker did not "honestly believe[]" that the employee engaged in the charged misconduct, then it could find that the alleged misconduct

was used as a pretext for discrimination. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 n.2 (11th Cir. 1989); *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991). "Where a fact-finder is required to weigh a deponent's credibility, summary judgment is simply improper." *Jenkins v. Nell*, 26 F.4th 1243, 1251 (11th Cir. 2022).

On summary judgment, Capstone suggested multiple reasons why Mr. McClinton's employment could have been terminated, but its corporate representative and Manager Langley testified to a single reason: he allegedly falsified the Corrective Action Notice. Doc. 64-2 at 76, 81; Doc. 64-5 at 8. That hotly disputed explanation is (1) inconsistent with the Corrective Action Notice itself, which states that Mr. McClinton was being warned (not fired) for the misconduct described therein, Doc. 64-1 at 229, and (2) inconsistent with Capstone's reply brief, which explains that the alleged "multiple terminable offenses" were not the basis for the termination decision because "Langley still wanted McClinton to succeed and become a valued member of the Capstone leadership team" despite those offenses, Doc. 78 at 27. Under the foregoing precedents, these inconsistencies preclude summary judgment.

Further, Mr. McClinton asserted that the evidence is sufficient to "allow[] a reasonable jur[y] to infer that Capstone regarded McClinton as disabled and fired him for having a perceived disability." Doc. 84 at 45-46. Mr. McClinton cited several pieces of evidence to support his argument, but one is sufficient for his disability

19

discrimination claim to survive summary judgment: the conflict in the testimony about the "alleged[ly] falsified Corrective Action Notice that Capstone" proffered as "the reason it fired McClinton." *Id.* at 46.

Mr. McClinton's testimony regarding the alteration of the Corrective Action Notice is fundamentally at odds with Manager Langley's. If a jury credited Mr. McClinton's testimony that he and Manager Langley agreed to amend the Corrective Action Notice, the jury could find that Manager Langley was "dishonest[]" when he accused Mr. McClinton the next day of doctoring the Corrective Action Notice, and that the accusation was a pretext to terminate Mr. McClinton's employment. *Reeves*, 530 U.S. at 147. A reasonable jury could then consider that dishonesty together with the evidence supporting Mr. McClinton's *prima facie* case of disability discrimination and find that disability discrimination is more likely than not the reason Capstone terminated Mr. McClinton's employment. *Id*. at 143.

On reply, Capstone referred to cases discussing a decisionmaker's "mistaken[]" but "good faith belief" about employee misconduct, but Capstone did not contend that Manager Langley mistakenly but in good faith believed that Mr. McClinton doctored the Corrective Action Notice. *See* Doc. 78 at 23 (cleaned up). Rather, Capstone directly attacked Mr. McClinton's testimony "that Langley agreed to amend the Corrective Action Notice" and asserted that the inconsistency of his testimony and other evidence is resolved by an "obvious answer": Mr. McClinton

20

"surreptitiously doctored" the Corrective Action Notice. *Id*. at 26-27 (cleaned up).

Put differently, Capstone invited the court to "weigh [two] deponent[s'] credibility."

*Jenkins*, 26 F.4th at 1251 (cleaned up). But in such cases, "summary judgment is

simply improper." *Id*. (cleaned up).

Capstone asserted also that Mr. McClinton must identify a "comparator

subjected to more favorable treatment for similar misconduct" to raise an inference

of ADA discrimination. Doc. 66 at 35 (citing *Lewis v. City of Union City*, 918 F.3d

1213 (11th Cir. 2019) (en banc) ("*Lewis I*")). Capstone incorrectly asserted that in

*Lewis I*, the court held that the plaintiff could not prove her ADA case because her

"comparators were not similarly situated" to her. Doc. 66 at 34-35. In *Lewis I*, the

plaintiff's ADA claims explicitly were "not before the en banc court," 918 F.3d at

1219 n.2, and on remand, the panel held that "a jury would be entitled to find that

the [defendant] . . . fired [the plaintiff] because it regarded her as disabled" in

violation of the ADA, notwithstanding her lack of comparator evidence, 934 F.3d

1169, 1182 (11th Cir. 2019).

At any rate, this case is fundamentally unlike *Lewis I* for two reasons. *First*,

the plaintiff's evidence to support her race and gender discrimination claims in *Lewis

I* "consist[ed] entirely of comparisons to two other officers." 918 F.3d at 1228 n.14.

*Lewis I* established the rule that "where the comparators are simply too dissimilar to

permit a valid inference that invidious discrimination is afoot," a plaintiff cannot

rely entirely on comparators to prove discrimination. *Id.* at 1229. *Lewis I* does not foreclose a plaintiff's reliance on evidence of suspicious timing and remarks to create an inference of discrimination. *See id.* at 1220 n.6 (acknowledging that discrimination may be inferred from other kinds of evidence). *Second*, in *Lewis I*, the factual circumstances surrounding the termination of the plaintiff's employment were undisputed: she "exhausted all of her accrued leave," continued to be absent without approval, and "was terminated pursuant to the [defendant's] Personnel Policy." *Id.* at 1219.

Mr. McClinton's evidence involves suspicious timing and remarks about his disability and a testimonial conflict about the reason Mr. McClinton's employment was terminated. Because Mr. McClinton does not rely on comparator evidence to raise an inference of discrimination, *Lewis I* does not require him to identify a similarly situated comparator to survive summary judgment.

Capstone failed to establish that there is an absence of evidence from which Mr. McClinton could prove his ADA disability discrimination claim, so its motion for summary judgment on that claim is **DENIED**.

### B. Counts Two and Three: ADA Retaliation and Failure to Accommodate

The ADA defines illegal "discrimination" to include an employer's failure to "mak[e] reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability . . . , unless such covered entity can

demonstrate that the accommodation would impose an undue hardship on the operation of the business[.]" 42 U.S.C. § 12112(b)(5)(A). "An accommodation is only reasonable if it allows the disabled employee to perform the essential functions of the job in question." *Frazier-White*, 818 F.3d at 1255. "What constitutes a reasonable accommodation depends on the circumstances, but it may include job restructuring, part-time or modified work schedules, and reassignment to a vacant position among other things." *Id*. (cleaned up). "The employee has the burden of identifying an accommodation and demonstrating that it is reasonable." *Id*. "Moreover, an employer's duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Id*. at 1255-56 (cleaned up).

The ADA's retaliation provision provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). "To prevail on her ADA retaliation claim, [a] [p]laintiff must show that: (1) she engaged in a statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was a causal link between the two." *Frazier-White*, 818 F.3d at 1258. "[A] request for a reasonable accommodation" is statutorily protected expression. *Id.*

Capstone asserted that Mr. McClinton's ADA retaliation and failure-to-accommodate claims fail for the same reasons that his ADA discrimination claim fails, Doc. 66 at 30, and the court rejects that assertion for the reasons already discussed. Capstone asserted also that "[t]he only two accommodations McClinton claims to have requested in this case are (i) an equal amount of time between the day and night shift supervisors;[2] and (ii) that he be permitted to use crutches." *Id*. at 29. According to Capstone, those requests are unreasonable, so Mr. McClinton cannot use them establish that he was denied a reasonable request or that he was retaliated against for such a request. *Id*. at 29-30.

The court rejects that assertion for three separate and independent reasons. *First*, Capstone failed to cite any evidence where Mr. McClinton identified those requests as the only accommodations on which his ADA claims rely, *cf. Four Parcels of Real Prop.*, 941 F.2d at 1438 n.19; *Clark,* 929 F.2d at 607-08, and Mr. McClinton asserted that his neurosurgeon's restrictions were also a request for a reasonable accommodation, Doc. 84 at 36-37; *see also* Doc. 32 ¶¶ 137-38. *Second*, Capstone did not explain why Mr. McClinton's request to return to his pre-surgery schedule was unreasonable as a matter of law. *Third*, Capstone's argument about

---

[2] It appears that Capstone is referring to Mr. McClinton's request "two weeks or so after [the] surgery" to "realign the schedule so [he] wouldn't have to work all weekend." Doc. 64-1 at 50. Mr. McClinton testified that when he returned to work from his surgery, Manager Langley made him work a weekend shift on top of his regular shift, so that he worked six days a week. *Id*. at 38, 50; *see also* Doc. 32 ¶¶ 140-43.

Mr. McClinton's request for crutches implicitly relies on its assertion about the essential functions of Mr. McClinton's job (*e.g.*, physical tasks like pushing and squatting) that the court rejected *supra* p. 14.

On reply, Capstone asserted that the accommodation requested in the return-to-work form executed by Mr. McClinton's neurosurgeon on March 18, 2019, was "unreasonable as a matter of law" because it lasted "indefinite[ly]." Doc. 78 at 15 (cleaned up) (citing [*Frazier-White v.*] *Gee*, 818 F.3d at 1256). Capstone relied on *Frazier-White*, in which a plaintiff was injured, became "unable to perform her regular . . . duties," and was "placed on light-duty status and temporarily assigned" to another position for nearly a year, at which time she presented a superior with her "handwritten note" requesting an additional extension of the light-duty arrangement. *Frazier-White*, 818 F.3d at 1252, 1256. The Eleventh Circuit held that that the plaintiff's indefinite request was "unreasonable as a matter of law" because "[t]he ADA covers people who can perform the essential functions of their jobs presently or in the immediate future," and the plaintiff "did not suggest a time frame for when she would be able to resume her full-duty position, and . . . later admitted . . . that she did not know how much time she needed or whether any amount of time would be sufficient." *Id*. at 1256 (cleaned up).

The court does not ordinarily consider arguments made for the first time on reply. But even if the court were to consider Capstone's argument about the note

from Mr. McClinton's neurosurgeon, the argument fails. This case is fundamentally different than *Frazier-White*. Here, a reasonable jury could find (based on the testimony by Capstone's corporate representative about Mr. McClinton's ability to perform the essential functions of his job) that the restrictions in his neurosurgeon's note did not render him unable to perform his regular duties nor require his temporary reassignment. And the duration of those restrictions, which had lasted only a few weeks at the time Mr. McClinton's employment was terminated and which were soon to be reevaluated in a follow-up visit to his neurosurgeon, is unlike the plaintiff's written request for an admittedly indefinite continuation of accommodations that had already lasted nearly a year. Accordingly, Capstone failed to establish that under *Frazier-White*, the accommodations requested in the note from Mr. McClinton's neurosurgeon were unreasonable as a matter of law.

Capstone failed to establish that there is an absence of evidence from which Mr. McClinton could prove his ADA accommodation and retaliation claims in Counts Two and Three, so its motion for summary judgment on those claims is **DENIED**.

### C. Count Four: ADEA Discrimination

The ADEA prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age" when the individual is "at least 40 years of age."

29 U.S.C. §§ 623(a)(1), 631(a). One way a plaintiff may raise an inference of age discrimination is by establishing that: (1) he was "between the age of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from which he was discharged." *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015). That inference of discrimination compares the plaintiff to the substantially younger person who replaced him, so a plaintiff must also establish that his younger comparator was "similarly situated [to him] in all material respects." *See Barneman v. Int'l Longshoreman Ass'n Loc. 1423*, 840 F. App'x 468, 479 (11th Cir. 2021) (cleaned up) (applying the comparator analysis in *Lewis I* to the *Liebman* framework); *accord Gibson v. JetBlue Airways Corp.*, No. 20-10943, 2021 WL 5368056, at *4 (11th Cir. Nov. 18, 2021); *Stimson v. Stryker Sales Corp.*, 835 F. App'x 993, 997 (11th Cir. 2020).

Capstone asserted that Mr. McClinton's ADEA claim fails because he was forty-three when his employment was terminated, and his replacement was "approximately 35 years old." Doc. 66 at 31. According to Capstone, that "eight-year difference is insufficient" as matter of law to satisfy the third element of a *prima facie* case of age discrimination. *Id*. Capstone's argument fails because under controlling precedent, a seven-year difference is sufficient. *Liebman*, 808 F.3d at 1299.

Capstone did not establish that Mr. McClinton's replacement was otherwise dissimilar for purposes of the comparator analysis under *Lewis I*. *See* Doc. 66 at 30-31. Capstone cited a nonbinding case in which a plaintiff who "did not meet the hiring criteria" was not hired to any of the thirty-one school positions for which he applied, two of which were filled by "former school principals" who were "six years younger than [him]." *Suarez v. Sch. Bd. of Hillsborough Cnty.*, 638 F. App'x 897, 898, 900-01 (11th Cir. 2016). The court held that an inference of age discrimination did not arise from those circumstances. *Id.* at 901 n.1. But Capstone did not assert that like the plaintiff's comparators in *Suarez*, Mr. McClinton's replacement was more qualified than he was for his position. *See* Doc. 66 at 31. And Mr. McClinton, who had held his position for nearly two years, is unlike the unqualified job applicant in *Suarez*.

To the extent that Capstone asserted that Mr. McClinton's ADEA claim fails because Mr. McClinton falsified company documents, *see id.* at 35-37, the court rejects that assertion at this time for the reasons already discussed. Accordingly, Capstone's motion to for summary judgment as to Count Four is **DENIED**.

### D. Counts Five and Six: FMLA Interference and Retaliation

The FMLA prohibits an employer from: (1) "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under [the FMLA]" (the interference clause), and (2) "discharg[ing] . . . any individual for

28

opposing any practice made unlawful by [the FMLA]" (the retaliation clause). 29 U.S.C. § 2615(a). There are "two types of claims for alleged violations of these provisions: interference claims, in which employers burden or outright deny substantive statutory rights to which their employees are entitled, and retaliation claims, in which employers discharge employees for exercising their FMLA right to leave." *O'Connor v. PCA Fam. Health Plan, Inc.*, 200 F.3d 1349, 1352 (11th Cir. 2000) (cleaned up).

In Count Five, Mr. McClinton alleged that Capstone interfered with his rights under the FMLA when it "terminated [his employment] because he needed to take care of his own serious health condition." Doc. 32 ¶ 204. Construed liberally, Count Six alleges that Capstone retaliated against Mr. McClinton by terminating his employment after he "gave . . . notice that he was in the Emergency Room" and "may need an additional surgery on his back." *Id*. ¶¶ 224-26.

"An FMLA interference claim lies if an employee can demonstrate . . . that she was entitled to an FMLA benefit and her employer denied her that benefit." *Munoz v. Selig Enters., Inc.*, 981 F.3d 1265, 1274 (11th Cir. 2020). "The FMLA provides eligible employees the right to 12 weeks of leave for a serious health condition that makes the employee unable to perform the functions of her position." *Id.*

"To establish a prima fac[i]e case of retaliation, a plaintiff must show (1) she participated in conduct that the statute protects; (2) she suffered an adverse employment action; and (3) the protected conduct and the adverse employment action are causally related. *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1219 (11th Cir. 2021). "The FMLA protects an employee who gives notice of an intent to use FMLA leave in the future." *Munoz*, 981 F.3d at 1276 (cleaned up).

Capstone asserted that Mr. McClinton's FMLA interference and retaliation claims fail because it has established "that it would have dismissed [Mr. McClinton] regardless of [his] request for FMLA benefits." Doc. 66 at 31-32 (cleaned up). In particular, Capstone asserts that between the time Mr. McClinton informed Manager Langley that he may need additional surgery and the time his employment was terminated, he engaged in "intervening misconduct" for which he was terminated (*i.e.*, he falsified the Corrective Action Notice). *Id*. at 32, 34. The court rejects that assertion for the reasons already discussed.

Capstone asserted also that Mr. McClinton's FMLA retaliation claim fails because the temporal proximity between the "statements" relevant to his claim on April 19, 2019, and the termination of his employment on April 22, 2019, is insufficient to infer causation. *Id*. at 32-33. The court rejects that assertion because three days is sufficiently close temporal proximity from which to infer causation, and causation is further supported by Mr. McClinton's evidence that Capstone's

stated reason for terminating his employment was pretext. *See, e.g., Jefferson*, 891 F.3d at 925-26. Accordingly, Capstone's motion for summary judgment on Counts Five and Six is **DENIED**.

### E. Capstone's Second Motion to Strike

In an order granting Capstone's motion to strike Mr. McClinton's amended opposition brief, the court provided Mr. McClinton fourteen days to file a second amended brief and warned him that the brief "must contain no . . . alterations" other than those specified in the order. Doc. 81 at 2. Thirteen days later, on the day before the deadline, Mr. McClinton filed a "Motion to Alter, Amend or Vacate the Court's Order" in which he expressed disagreement with the court's reasoning on that issue. Doc. 82. While that motion was pending, Mr. McClinton filed a second amended brief that contained numerous (and material) alterations other than those specified in the order. Doc. 84. Those alterations openly disregarded the order striking the original brief: according to Mr. McClinton's counsel, the unauthorized alterations were made "[o]ut of the abundance of caution" while awaiting the disposition of the Motion to Alter. *Id.* at 26 n.28. Capstone again moved to strike. Doc. 85.

An exercise in caution would have led counsel to comply with a court order, even if counsel had lingering disagreements with the order. Willfully violating a court order is contemptuous, not cautious. The court has "*sua sponte* exercise[d] [its] discretion to accept [Mr. McClinton's] brief despite its deficiencies" and consider it

on the merits for three reasons. *Wimbush v. Conway*, 768 F. App'x 958, 963 n.6 (11th Cir. 2019). *First*, it appears that Mr. McClinton's counsel, not Mr. McClinton himself, is responsible for filing a noncompliant brief. *Second*, striking Mr. McClinton's brief would render Capstone's statement of undisputed facts admitted, which would likely be tantamount to a sanction of dismissal. *Third*, as discussed *supra* pp. 6-7, Capstone misrepresented the evidence in its statement of undisputed facts, so the court is not inclined to find that Capstone is entitled to the relief it requests.

Accordingly, the court will set a hearing to determine (1) whether and to what extent sanctions are appropriate to address Mr. McClinton's counsel's violation of the court's July 15, 2022 order, Doc. 81, and (2) whether and to what extent sanctions are appropriate to address Capstone's counsel's material misrepresentation of fact, discussed *supra* pp. 6-7. Mr. McClinton's counsel should be prepared also to explain why their aberration from the format of their previous briefs (by narrowing the margins to one-half inch) was not an "attempt to circumvent applicable page limitations, which limitations had already been extended." Doc. 81 at 2.

## IV. CONCLUSION

For the foregoing reasons, Mr. McClinton's motion to amend, Doc. 82, Capstone's motion for summary judgment, Doc. 65, and its motion to strike, Doc. 85, are **DENIED**.

**DONE** and **ORDERED** this 28th day of November, 2022.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE