FILED
2023 Jan-31 PM 06:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


RICHARD J. MCCLINTON,            2:20-cv-543-AMM

          Plaintiff,            January 24, 2023

vs.                            Birmingham, Alabama

COGENCY GLOBAL, INC.,           10:30 a.m.

          Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * *


REPORTER'S OFFICIAL TRANSCRIPT OF
SHOW CAUSE HEARING


BEFORE THE HONORABLE ANNA M. MANASCO
UNITED STATES DISTRICT JUDGE


COURT REPORTER:
Teresa Roberson, RMR
Federal Official Court Reporter
1729 Fifth Avenue North, Ste. 200
Birmingham, Alabama  35203

```
 1                      * * * * *

 2                 A P P E A R A N C E S

 3                      * * * * *

 4    FOR THE PLAINTIFF:

 5    Blake Edwards
      Nicole Edwards
 6    Edwards & Edwards
      3603 Pine Lane SE, Suite C
 7    Bessemer, Alabama  35022

 8

 9    FOR THE DEFENDANT:

10    David Klass
      Richard Bryan Holbrook
11    Fisher & Phillips
      227 West Trade Street, Suite 2020
12    Charlotte, NC  28202

13    Marion Walker
      Fisher Phillips
14    2100A Southbridge Parkway
      Birmingham, Alabama  35209
15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        * * * * *
 2                 P R O C E E D I N G S
 3                        * * * * *
 4           THE COURT:  Please state your appearances.
 5           MR. EDWARDS:  Blake Edwards appearing for the
 6  plaintiff Jason McClinton.
 7           MS. EDWARDS:  Nicole Edwards appearing for the
 8  plaintiff Jason McClinton.
 9           MR. HOLBROOK:  Bryan Holbrook for the defendant
10  Capstone.
11           MR. KLASS:  David Klass for defendant.
12           MS. WALKER:  Marion Walker for the defendant.
13           THE COURT:  Good morning.  All right.  So we've
14  got several things to do today.
15           Couple of things, I guess, first, I have some
16  questions.  And then I want to know a little bit more about
17  the attempt that was made previously to mediate the case and
18  what the -- I'm not quite clear on what the current status
19  is from the statements on mediation that were filed.  And
20  then we will today enter a pretrial order, so I'll go ahead
21  and give y'all the dates that are embedded in that.
22           Before I start with my questions.  Tell me a
23  little bit more about what the parties' respective positions
24  are on further mediation.
25           MS. EDWARDS:  Your Honor, we are always willing to
```

1  mediate.  We were ordered to mediate earlier in this case,

2  it was unsuccessful.  That could have been because no

3  depositions were taken, I'm not sure.  But we were so far

4  apart.  Brett Adair was our mediator in that case.  We

5  picked him because he knew both sides, but he just couldn't

6  get us there.  And the numbers were so far apart that I

7  think we ended it at a half-day mediation.

8        Prior to that, we started talking about mediation

9  after Your Honor entered her opinion and order.  And it was

10 from our client's perspective that we would love to go, but

11 we just can't pay for it again.

12       And I don't think the defendant was willing to go

13 to mediation that they had to pay for.

14       And then the other side asked about a magistrate

15 mediation.  And I explained to them that you only get so

16 many, and so I can't really agree to that without knowing

17 who you're choosing to go to.  So that's kind of where we

18 are from my position.

19       THE COURT:  Well, the way the magistrate mediation

20 works is that district judges have a limited number of

21 opportunities per year to refer them.  We don't refer them

22 to specific magistrate judges.  We refer to a magistrate

23 judge.

24       So, number one, you could certainly agree to ask

25 me to refer it to a magistrate judge, and I would have to --

1    I take a lot of considerations into account with that.

2    Sometimes mediations that need to occur at no cost are a

3    consideration; sometimes where we are in the calendar year

4    is a consideration because I have exhausted all my cards;

5    and sometimes where there's agreement that the case is a

6    candidate for mediation is a consideration.

7         But certainly there is no limitation that -- the

8    limitation is on me, it's not on y'all.  Y'all can certainly

9    agree to ask for that.

10         The previous mediation, were costs shared --

11    entirely by the plaintiff, entirely by the defendant or

12    both?

13         MS. EDWARDS:  Divided equally, Your Honor.

14         THE COURT:  Okay.  So the plaintiff's position is

15    that it would not be willing to divide them evenly again,

16    except that, I assume, by Court order.

17         MS. EDWARDS:  Yes, Your Honor.  We obviously have

18    put a lot of expenses into the case, and we're not in a

19    position where we can do that.

20         THE COURT:  Defendants.

21         MR. KLASS:  Your Honor, I believe we mediated it

22    in -- this case in summer of 2021, and we do agree that we

23    were pretty far apart at that mediation.  I don't know if

24    either party's position has changed materially since then,

25    but we are still open to mediating the case again, whether

1    it's before a magistrate judge or a private mediator.

2          Mr. Adair had reached out some months ago, I think

3    he would be willing to mediate again.  I thought he was

4    good.

5          In terms of, I think the breakdown, most recently,

6    it was over defendant agreeing upfront to pay plaintiff's

7    share of the mediation costs.

8          And our position is, this is plaintiff's case, the

9    default is that the parties split mediation costs equally.

10         Of course, if there's an agreement reached at

11   mediation, it's common for the defendant to pick up the cost

12   at that time, but that's not something that the defendant is

13   willing to do up front.

14         THE COURT:  Good it.  Understood.  That's all

15   helpful to me.

16         So my practice is not to try a case that has not

17   mediated, but y'all have mediated once.  So I would not

18   necessarily require you to mediate again unless it were a

19   situation where there were, you know, through a consensus

20   among the lawyers that this case was a really good candidate

21   for settlement and it would be unwise or just not fruitful

22   to try it, and then I would probably order you to mediate

23   again because trying a case that should have settled is in

24   nobody's interest.

25         So that is helpful to me to figure out where we

1  are.  I would encourage you to continue the conversation

2  among lawyers.

3          It sounds to me like there has been a material

4  change in circumstances since the first mediation in that we

5  are now through discovery and past summary judgment.

6          So it's not, you know, I do not see why there

7  would be any difficulty in more appropriately valuing the

8  case.  Whereas I could certainly see that before summary

9  judgment and before discovery had completed.

10         So let me ask, I guess the next thing we'll do

11  before we talk about pretrial, I need to ask some questions

12  about the motions to strike and the oppositions and the

13  summary judgment motions.

14         I'm going to start with the plaintiffs.  And y'all

15  can take these at the table or at the lectern, wherever

16  suits you best.

17         So, plaintiff's first response brief was Doc 72.

18  Second one -- well, let's talk about Doc 72 first because I

19  have got it.

20         All right.  So, for Doc 72, the first thing that

21  caught our eye was the half-inch margins.  And the next

22  thing was the substantially lengthy footnotes --

23  single-spaced, ten point, twenty-seven of them.

24         And then the next thing was the charts.  Although

25  I understand your argument that those were included for the

1 | convenience of the Court, and I don't doubt that sometimes
2 | charts can be really helpful.
3 |   So you got a ten page extension, but then made
4 | changes to the formatting to cram substantially more than
5 | forty-five pages worth of information into a forty-five page
6 | brief.
7 |   Well, actually, hang on, let's see.  Forty-two and
8 | a half page brief.  Why?
9 |   I guess part of my question, why didn't you ask
10 | for a fifteen page extension.
11 |   MS. EDWARDS:  Well, Your Honor, I thought I was
12 | here to just talk about the material changes from the first
13 | to the second, but I can answer that as well.
14 |   I didn't believe we made any arguments in the
15 | footnotes.  Correct me if I'm wrong, if you don't mind
16 | pulling it up.
17 |   But, yes, the reason for the chart was to make it
18 | easier for the clerks, the Judge, me -- thinking that's just
19 | how I think, if I could put everything on a spreadsheet I
20 | would be happy.
21 |   But, yes, I made the charts to make it easy.  And
22 | then when I moved what was in the charts into the second
23 | amended complaint, I did so because I had the allotted pages
24 | left.
25 |   So that was my only thinking.  I wasn't trying to

1    disrespect the Court in any way.  We believe in order, we

2    believe in your position, whatever you say goes.

3         I was really thinking it would be more simple for

4    everybody, and that was the only reason for the charts.  So

5    if that answers your questions.

6         THE COURT:  The charts I have less concern than

7    the margins and the footnotes.  I understand your argument

8    you didn't make arguments in the footnotes.  But briefs

9    contain all kinds of things that aren't arguments --

10   information, citation -- and if we shove several pages of

11   information in the footnotes and tighten the margins, we

12   have obviously exceeded the page limits.  That got us off to

13   a bad start.

14        MS. EDWARDS:  Yes, Your Honor.

15        THE COURT:  Let's talk about the changes from

16   the -- following the order striking the first amended brief.

17        So the order was clear that the second amended

18   brief had to admit certain paragraphs, contain no other

19   alterations.  That's not what happened.

20        MS. EDWARDS:  First of all, I'm sorry for any kind

21   of disrespect that that was to you.

22        I -- we got down to the very last day, and I

23   apologize for my motion to strike and vacate filing the day

24   before my brief was done, but it came to the point where we

25   just saw the facts that were in the charts were material,

1    and I really was just -- I was in a conundrum.  So that's

2    why I filed the motion to alter, amend or vacate only

3    because I wanted to make sure that my client had all the

4    facts presented.  And also if -- to preserve it on appeal.

5    If I don't bring it up in district court, I can't bring it

6    up at the appellate court.  And I didn't know what to do.

7    That was -- that was my reasoning for that.  And I apologize

8    it happened on the last hour, you didn't even have time to

9    review it or rule on it.

10         That was just where I was in the brief.  And we

11   were like, oh, no, we have to get these facts in.  And

12   because we had the page limit left, we thought that it would

13   be okay and it would be easier to strike it than to file

14   another brief.

15         So that was my only thinking filing that amended,

16   alter or vacate.

17         THE COURT:  Okay.  Is it your ordinary practice to

18   request page limit extensions, or do you regard this as an

19   unusual case?

20         MS. EDWARDS:  I would say this is a fact extensive

21   case.  I normally do ask for page extensions.  I know the

22   Middle District doesn't have a page limit requirement.  I'm

23   trying to learn everybody's different orders on how they do

24   things.

25         We typically have to, because not only do we have

1   to respond to everything they say, but we have to include

2   all the depositions that the defense doesn't bring up and

3   all the facts in there.

4        And so the facts reason why is what we always

5   request an extension.  And we never really know how long

6   that is, but we found in our practice that judges are

7   normally allowing us ten, if we go above ten, they are

8   saying no to us, and that's why I didn't request more than

9   ten because we normally just get that ten page limit

10  barrier, so that's why I asked for that.

11       THE COURT:  Okay.  Well, that's helpful for me to

12  understand.

13       I guess my advice for moving forward would be

14  this:  Almost all cases at some point come up against a page

15  limitation or word limitation -- the Alabama Supreme Court,

16  this Court, the Eleventh Circuit, the Supreme Court -- if

17  this had happened in the Eleventh Circuit, it would not be a

18  conversation.

19       So I am certain that you have the ability not to

20  do it this way.  I actually don't really have an objection

21  to fifteen page extensions when a lawyer tells me that they

22  are sincerely needed because the case is very voluminous or

23  there's been a lot of testimony.

24       But whatever the page extension or page limit is

25  it has got to be adhered to.  Because now my problem is not

1    just in this case.  If this happens in this case, then I can

2    expect to deal with it in all kind of cases going forward.

3    And now you and I both have a lot more time into this case

4    than we really need to.

5                All right.  I think that's all I've got for you.

6                All right.  Capstone, who is taking this?

7                MR. HOLBROOK:  I'm going to take this one, Your

8    Honor.  I thought it would be appropriate, I was the

9    principal drafter.

10               THE COURT:  You were the principal drafter?

11               MR. HOLBROOK:  Yes, Your Honor.

12               THE COURT:  I was the principal drafter of briefs

13   at a time as a lawyer and didn't speak at the oral argument,

14   and always knew the judge was on the ball when they asked

15   the lawyer who stood up and talked, did you draft the brief

16   or did you just sign it.

17               MR. HOLBROOK:  Yes, Your Honor.

18               THE COURT:  I think you know what my question is

19   for you.  It has to do with the statement of undisputed

20   fact.  Paragraph 29, Doc 66.

21               The next morning, April 19th, 2019, a Friday,

22   Langley discovered that McClinton had doctored the

23   corrective action notice to indicate that he received only a

24   verbal first warning and that the next action to be taken

25   would be a suspension.  There's some citations.  Langley

1    knew that McClinton doctored the documents because the

2    alterations that McClinton made in blue ink were clearly

3    different than the black X marks that were auto-generated by

4    the computer.

5            Was it your understanding that Mr. McClinton did

6    not dispute that he had doctored the corrective action

7    notice?

8            MR. HOLBROOK:  No, Your Honor.  Well, I want to

9    make sure I'm answering this clearly.

10           So, it was never our intention to mislead the

11   Court that this was a dispute between the parties.  It's the

12   central allegation in his complaint.  It's in his testimony.

13   We asked him about that at deposition.

14           And I think what we were trying to do, and it's

15   clear that I wasn't clear in my drafting, was to make the

16   argument, we did cite some cases for this proposition, that

17   the factual dispute was not genuine.  In other words, that

18   he could not override pre-existing documents, documents that

19   were contemporaneously created in time when this happened

20   and that he could not effectively revise a Capstone policy

21   through his own testimony.  If I may explain a little why I

22   mean that.

23           THE COURT:  Well, I understand the law and all

24   that.

25           MR. HOLBROOK:  Sure, sure.

1    THE COURT:  When I'm reading the briefs and I get

2    to that point, I know, by now, just by this point of having

3    the case, that he seriously disputes this fact.  And I

4    understand all your arguments about why it's not genuine and

5    I -- those are arguments that would be the appropriate

6    subject at a summary judgment hearing or a briefing or order

7    or whatever.

8         But the assertion that the fact is undisputed,

9    when I come to it and know that it is not accurate, you can

10   see how I begin to doubt all of the other assertions.

11   Because that one I just know by having worked with the case

12   and familiar with the case, I know that's a central dispute

13   issue, whether he doctored it or not, what testimony is on

14   that.

15        But I don't necessarily off the top of my head

16   know that anything else in here is misstated when I come

17   upon it.

18        So now I am digging back through every statement

19   to figure out, and this is similar to the thing I just said

20   about further alterations being made in an amended brief

21   after I ordered no further altercations, I've got to dig

22   through the filing because I can no longer trust what's in

23   there.

24        I don't need legal arguments on the disputed fact

25   is genuine or not, I understand the law on that.

 1          But how did it make it into the statement of

 2   undisputed fact?

 3          MR. HOLBROOK:  So, sort of subsidiary to the

 4   genuine issue, the argument that we are making, we relied --

 5   and I realize I wasn't clear.  I do apologize for that.

 6          We were relying on the Burns versus Rogers case

 7   that we cited on Page 24 and that's where this Court quoted

 8   Scott vs. Harris and the Supreme Court, when opposing

 9   parties tell two different stories, one of which is

10   blatantly contradicted by the record so that no reasonable

11   jury can believe, the Court should not adopt that version of

12   the facts for purposes of ruling on summary judgment.

13          That's what the courts -- the Supreme Court said

14   in Scott.  That case has been cited, as of this morning, I

15   double checked, 6,614 times.  This Court has relied on it to

16   grant summary judgment.  The Eleventh Circuit has affirmed

17   summary judgment in the employment context for the employer

18   under this standard, including an FMLA.  And that case is

19   Word vs. AT&T, 2014, Eleventh Circuit case, so that's what

20   we were trying to do.  I realize it wasn't clear.  That was

21   certainly not our --

22          THE COURT:  It was more than not clear.  I mean,

23   it's inaccurate.  There should have been some quality

24   control mechanism that would have caught that -- your legal

25   argument, you know, may be well founded.  I completely

1  understand the legal argument, somebody who spends a lot of

2  time dealing with summary judgment motions.

3         But the statement that he doesn't dispute -- now,

4  there is a legal argument about whether his dispute matters,

5  whether it is sufficient to create a genuine issue; what its

6  legal function and significance is.

7         But to say that he doesn't dispute it isn't just

8  unclear, it's the opposite of what's true.

9         So I will ask you like the same question I asked

10  them which is, is it your ordinary practice, if you are

11  going to make this argument, which I think is pretty common

12  on summary judgment where the only evidence on some issue is

13  the plaintiff's self-serving testimony, if you are going to

14  make this argument, that you present the fact as undisputed,

15  is this the first time that this has come up?

16         MR. HOLBROOK:  Your Honor, that's not what we were

17  trying to do.  And we said, it's on Page 36 of our brief

18  where we said that his self-serving allegation that Langley

19  agreed to change corrective action notice is rebutted and we

20  went through the categories of evidence, and then we went on

21  to say, in our conclusion, his efforts to manufacture a

22  dispute of fact based solely on this testimony should be

23  rejected.  That was in our conclusion.

24         And we did the same in our reply brief where we

25  cite to the Word case.  And, like I said, I very much

1   apologize for not being more clear.  That's not what we were

2   trying to do.

3           If I may just explain a little bit what our

4   thinking was.  He agrees -- we understand the central

5   dispute again that he says he changed it.

6           Our position that we tried to articulate which was

7   not clear, I can tell that from the Court's ruling, was that

8   to understand why he had this document was -- excuse me, to

9   understand his position that this document was changed, you

10  have to ask, well, why is it that he's saying that it's

11  changed.  And he says that for two reasons.

12          He says, number one, Capstone has a mandatory

13  progressive discipline policy that they have to follow.

14          And he says, number two, that he never received

15  any discipline under this mandatory progressive discipline

16  policy.

17          So the argument that we were trying to make was

18  that not only does Capstone not have a progressive

19  discipline policy, we cited the deposition testimony

20  authenticating that document that says Capstone reserves the

21  right to terminate an associate at any time for any reason

22  with or without prior discipline.  And it goes on to say,

23  nothing in this handbook or any Capstone document is

24  intended to promise progressive discipline or disciplinary

25  counseling.

```
 1          And then, Your Honor, we went through his second

 2    point which is, I have never received any verbal counseling

 3    or any discipline like that.  And so because I have never

 4    received that, I can't receive this corrective action

 5    notice.

 6          What we were trying to articulate is that he

 7    cannot create a dispute of fact by saying, even though the

 8    policy says this isn't progressive discipline, I'm saying

 9    that it is progressive discipline that's required.  And even

10    though he had all of this prior discipline for months before

11    he even told Capstone that he needed back surgery, that he

12    could just say, and this is what he testified, that none of

13    this ever happened.

14          So that's what we were trying to articulate to say

15    that this isn't actually in dispute.  He is saying it.  But

16    he can't rewrite a document.  That's what we tried to do on

17    our reply brief as well, he would have the Court ignore or

18    alter or amend the contents of these fourteen different

19    categories of documents.

20          So, for example, on the change specifically, I

21    want to flag some testimony in the brief --

22          MS. EDWARDS:  Your Honor, if I --

23          THE COURT:  You'll get a turn.

24          MR. HOLBROOK:  So there's no dispute between the

25    parties that Mr. Langley signed and dated the corrective
```

1    action notice before he handed it to Mr. McClinton.

2          And on the plaintiff's brief, they say, quote,

3    Langley amended the corrective action notice form, signed

4    the form, and then presented it to Mr. McClinton.  That's

5    the quote from their brief.

6          And then the plaintiff's testimony, he was asked

7    the question:  And then did he actually write on it what the

8    changes were?  Answer:  He marked -- finished marking what

9    wasn't marked and then he signed it, slid it back to me and

10   I signed it.

11         Question:  Who signed it first, you or he?  Donald

12   Langley signed it and slid it to me and I signed it.

13         Last question:  Who wrote the blue ink next to the

14   box termination?  Well, it would be the same pen.

15         So, according to this plaintiff's testimony,

16   Mr. Langley typed this out, comes in there, makes the

17   amendment in a blue pen, then sets that blue pen down, signs

18   it in a black pen, and then Mr. McClinton signs with the

19   same blue pen that the changes were made with.

20         And that's what we were trying to convey was that

21   this is not a genuine dispute of fact because no rational

22   jury would believe that.

23         I have actually got a document here, I would like

24   to offer it to the Court, I don't want to overstep, where we

25   go through all of that prior discipline.  The Court, I

 1    believe, noted that was immaterial.

 2          But our position would be because, A, all of this

 3    occurred before he even told us that he needed back surgery,

 4    and because all of the contents of that document are

 5    specifically referenced in the corrective action notice that

 6    tracks all this prior discipline, that again the plaintiff

 7    says, even though there is an email, it's very specific, oh,

 8    no, this never happened.  What we were trying to convey was

 9    that this is not a genuine dispute of fact.  He can't put

10    this in dispute just by saying none of these five documented

11    instances occurred.  And then with the -- that no reasonable

12    jury would believe the switch, contemporaneous in time with

13    the change --

14          THE COURT:  I fully understand the legal argument.

15    But none of it is responsive to my concern.

16          By the time I got to the legal argument section of

17    the brief, I didn't trust it because of what had been

18    presented as undisputed fact.  I understand it.  I totally

19    comprehend what you are saying and the reason that you are

20    articulating the argument and the legal function of the

21    argument.

22          But it is not undisputed that Langley discovered

23    that McClinton had doctored the corrective action notice,

24    that the doctored corrective action notice was internally

25    inconsistent -- that is your position offered as a statement

1  of undisputed fact.

2        So the legal argument I get, and it's in the

3  brief.  I mean, it shows up in the brief and we would have

4  talked about it at summary judgment hearing.  But the

5  problem is what's presented as an undisputed fact.

6        Now, your argument that the dispute ought to be

7  overlooked because it's of no legal significance, I

8  understand that is what you are trying to convey in the

9  argument section of the brief.

10        But how these statements made it into a statement

11  of undisputed fact is still what I'm concerned about.

12        MR. HOLBROOK:  I understand that.  What we were

13  trying to do, and I printed out the Court's guidance on

14  summary judgment briefing.  I have to tell you, I had an

15  associate look at sort of these parallels -- it's kind of an

16  extension of the Sham Affidavit Doctrine, if you will.  Had

17  an associate look to make sure has this Court recognized

18  this, that kind of thing.  And so what we were trying to

19  articulate was, again, it's not genuine because it's not

20  backed up by any -- by any evidence other than just him

21  saying it.  Right?

22        Every time this man was confronted with a document

23  in deposition, he either said, oh, that never happened.  And

24  there was one that was actually a counseling that he

25  forwarded to him --

1        THE COURT:  You could have made all of these

2   arguments in Paragraph 29, literally never appeared in your

3   brief.  Or if you had included it in a section that says,

4   you know, if you had reworded it to say, he disputes this,

5   and later in this brief we are going to explain to the Court

6   why his dispute ought to be overlooked, that would have been

7   true and would have done no damage whatsoever to your

8   argument.

9        The problem, I mean, this is really a self

10  inflicted wound because I had not read the argument when I

11  read Paragraph 29, so already alarm bells are sort of going

12  off in my head before I ever get to your legal argument.

13       I think I have heard enough to understand where we

14  are.

15       So I guess overall -- well, you wanted to say

16  something before I --

17       MS. EDWARDS:  Oh.  Your Honor, I was just going to

18  object because he was making a summary judgment argument at

19  a --

20       THE COURT:  I'm not worried about any of that.  I

21  have ruled on summary judgment.  And I understand the

22  argument that is not responsive to my particular concern,

23  but I do correctly apprehend the argument having been

24  through the briefs.

25       My concern about this situation is that, number

one, it potentially has made this case unsettleable because the fees are now so great.  We have motions to strike, amended response briefs, I assume everybody spent some time getting ready for today, now we're all here.  Everybody in the room has more time in the case than anybody needed to have.  And we are roaring toward a trial where we are going to have a ton of time in the case.

I would caution you against any kind of lapses like this in the future.

I really do not know what an appropriate sanction is for any of this because this is not your client's fault.  And I am past the point in the case where I can sort of craft a sanction that will not permanently negatively impact your client, if I strike a pleading or some evidence or construe evidence in a particular way, so I have to spend some time thinking about what an appropriate order will make clear this is not appropriate counsel conduct but that will not disadvantage anyone's client.

In the short term, my immediate concern is making sure that we are all clear that there has got to be better quality control as we roar into trial.  There will be no time for this and there will be not nearly this amount of patience for it.

So, whatever internal processes you need to employ to make sure that we can comply with Court orders and what

1    we say in pleadings is actually verifiable, would be wise to

2    employ at the earliest opportunity.

3         I am going to set this case for trial on May the

4    30th; that's a four-day week.  But I recall from the 26(f)

5    report we thought it was a three to four day trial.  So I am

6    assuming we can accomplish it in that week.

7         We'll drop our pretrial order later today but that

8    will put your first deadline for witness and exhibit list

9    somewhere in the early April range in order to allow time

10   for motions in limine, objections, jointly proposed jury

11   charges and all that.

12        I am not going to order the case to mediation

13   again because we have already done that.  And if there is

14   not consensus among the lawyers that the case is not a good

15   candidate for settlement, feels unreasonable to order it to

16   mediation again.

17        But I would hope that the highest and best use for

18   the next sixty days, other than getting ready for trial,

19   would be to have serious conversations about trying to

20   settle this case.

21        If the plaintiff is not in a position to pay for

22   half of mediation, it's difficult for me to understand how

23   plaintiff is in a position to go to trial.

24        I think the highest and best use of the next

25   period of time would be to have conversations among the

1    lawyers that will facilitate a settlement.

2              This case is three year reportable in September of

3    2023, and our summer calendar is pretty full.  I did not put

4    this on Memorial Day week for fun.  I did it because that is

5    where I could find four neat days clustered together without

6    other civil or criminal cases throughout the summer.  So

7    there is no ability to stay or continue the trial to

8    accommodate a desire at the last minute to mediate further.

9    It will be state court style, everything is happening at

10   once, mediating while we are trying to get ready for trial,

11   which is not any problem for me.  But I know it's miserable

12   for lawyers.  I did it enough times to remember it well.

13             So I would encourage you not to take us to the

14   brink in that way.  Certainly understanding that we really

15   are sort of at what is approaching the last moment for this

16   case in terms of extensions and continuances.

17             I will commit that we will get a sanctions order

18   out, what's today, the 24th, we will get a sanctions order

19   out by the end of February.  And I will give you each seven

20   days from today to submit just like a short brief on what

21   you think would be the most appropriate sanction, if any.

22   By short, I mean like five to ten pages, normal

23   double-spaced margins.  If it doesn't take five to ten, that

24   is not any problem.  I don't need a legal tone.  I want you

25   to have opportunity to brief that or say something on that

1    because I realize what you came prepared with today is

2    probably more explanation than legal argument about what the

3    appropriate sanction is.

4           So that will be helpful.  And then we commit to

5    get an order out by the end of February so everybody knows

6    where they stand as we get ready for trial.

7           Any questions?

8           MS. EDWARDS:  No, Your Honor.

9           MR. HOLBROOK:  No, Your Honor.

10          THE COURT:  Thanks.  Y'all a great day.

11                     (COURT ADJOURNED)

C E R T I F I C A T E

    I hereby certify that the foregoing is a correct
transcript from the record of the proceedings in the above-
referenced matter.


_____
Teresa Roberson, RPR, RMR