FILED

2024 Mar-27  PM 04:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **RICHARD J. MCCLINTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:20-cv-543-AMM** |
| | ) | |
| **COGENCY GLOBAL, INC.,** | ) | |
| **d/b/a CAPSTONE LOGISTICS,** | ) | |
| **LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case is before the court on post-trial motions. Defendant Capstone Logistics, LLC ("Capstone") filed a renewed motion for judgment as a matter of law, a motion for a new trial, and a motion for a remittitur in the alternative. Doc. 175. Plaintiff Richard McClinton filed a motion for attorney's fees and expenses, Doc. 178, and a motion to alter or amend the final judgment to include equitable relief. Doc. 180.

For the reasons stated below, Capstone's renewed motion for judgment as a matter of law is **DENIED**. Its motion for a new trial is also **DENIED**. Its motion for a remittitur is **GRANTED IN PART** and **DENIED IN PART**. Mr. McClinton's motion for attorney's fees and expenses is **GRANTED**. Mr. McClinton's motion to alter or amend the final judgment is **GRANTED**.

## I. BACKGROUND

Based on the parties' stipulations, the following facts are undisputed. In 2017, "Capstone's employees unload[ed] trucks at a Dollar General warehouse in Bessemer, Alabama." *See* Doc. 101 at 3 ("Undisputed Facts"). "On July 31, 2017, [Mr.] McClinton began working for Capstone as a Second Shift Supervisor at the Bessemer, Alabama warehouse." *Id*. "[Mr.] McClinton supervised 'unloaders' that [were] responsible for unloading freight and placing it onto pallets for distribution by Dollar General." *Id*. Mr. McClinton "worked under the direct supervision of . . . Donald Langley." *Id*. Capstone terminated Mr. McClinton's employment on April 22, 2019. *Id*. at 2.

Mr. McClinton filed this action on April 21, 2020, alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* Mr. McClinton's second amended complaint asserted six claims against Capstone. Doc. 32. Count One alleged disparate treatment under the ADA. Count Two alleged retaliation under the ADA. Count Three alleged denial of reasonable accommodations under the ADA. Count Four alleged discrimination under the ADEA. Count Five alleged interference with Mr. McClinton's substantive rights under the FMLA. Count Six alleged

retaliation under the FMLA. Capstone moved for summary judgment on all six claims, Doc. 65, which was denied, Doc. 87.

After a four-day trial, the jury returned a verdict in favor of Mr. McClinton on four of the six claims. For the ADA disparate treatment claim, the jury found that: (1) Mr. McClinton had a disability; (2) Mr. McClinton was a qualified individual; (3) Capstone fired Mr. McClinton because of his disability. Doc. 162 at 3. The jury found that Mr. McClinton should be awarded $272,000 in net loss of wages and benefits to the date of the verdict, and $200,000 for emotional pain and mental anguish; the jury also found that Capstone should be assessed $544,000 in punitive damages. *Id.* at 3–4.

For the ADA reasonable accommodation claim, the jury found that: (1) Mr. McClinton had a disability; (2) Mr. McClinton was a qualified individual; (3) Capstone knew of Mr. McClinton's disability; (4) Mr. McClinton requested an accommodation; (5) a reasonable accommodation existed that would have allowed Mr. McClinton to perform the essential functions of the job; (6) Capstone failed to provide a reasonable accommodation; (7) Capstone did not make good faith efforts to identify and make a reasonable accommodation for Mr. McClinton; (8) Mr. McClinton's requested accommodation would not have imposed an undue hardship on the operation of Capstone's business. *Id*. at 5–7. The jury found that Mr. McClinton should be awarded $272,000 in net loss of wages and benefits to the date

of the verdict, and $200,000 for emotional pain and mental anguish; the jury also found that Capstone should be assessed $544,000 in punitive damages. *Id*. at 7–8.

For the ADA retaliation claim, the jury found that: (1) Mr. McClinton engaged in protected activity; (2) Capstone took adverse employment action because of Mr. McClinton's protected activity; (3) Mr. McClinton suffered damages because of the adverse employment action. *Id*. at 9. The jury found that Mr. McClinton should be awarded $272,000 in net loss of wages and benefits to the date of the verdict, and $200,000 for emotional pain and mental anguish; the jury also found that Capstone should be assessed $544,000 in punitive damages. *Id*. at 9–10.

For the FMLA interference claim, the jury found that: (1) Mr. McClinton was entitled to FMLA leave; (2) Mr. McClinton gave Capstone proper notice of his need for leave; (3) Capstone interfered with Mr. McClinton's FMLA rights.[1] *Id*. at 11. The jury found that Mr. McClinton should be awarded $200,000 in damages. *Id*. at 12.

The jury found that Mr. McClinton did not meet the burden of proof on his ADEA discrimination claim and his FMLA retaliation claim. *See id*. at 2, 13. For the FMLA retaliation claim, the jury found that Mr. McClinton did not properly request FMLA leave. *Id*. at 13.

---

[1] The parties did not dispute that Mr. McClinton was eligible for FMLA leave. Doc. 162 at 11.

For all four claims that the jury found in favor of Mr. McClinton, Capstone renewed its motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. *See* Doc. 176. Capstone's motion for a new trial under Rule 59 was limited only to Mr. McClinton's FMLA interference claim. *See id*. at 46.

Capstone moved in the alternative for a remittitur of damages under Rule 59. *See id*. at 57. Capstone moved only for a remittitur of damages for Mr. McClinton's ADA claims; Capstone did not move for a remittitur of damages for his FMLA interference claim. *See id*. at 57–71.

Mr. McClinton moved for attorney's fees, Doc. 178, and to alter or amend the final judgment to include equitable relief, Doc. 180.

## II. LEGAL STANDARD

### A. Rule 50(b) Standard

Under Federal Rule of Civil Procedure 50, judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving party.]" Fed. R. Civ. P. 50(a)(1). Under controlling precedent, "[j]udgment as a matter of law is appropriate only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." *Luxottica Group, S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1310 (11th Cir. 2019) (cleaned up). "If there

is substantial conflict in the evidence, such that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion must be denied." *Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012) (cleaned up).

"[T]he jury's particular findings are not germane to [this] legal analysis." *Chaney v. City of Orlando*, 483 F.3d 1221, 1228 (11th Cir. 2007). That is, "[o]nly the sufficiency of the evidence matters; what the jury actually found is irrelevant." *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 724 (11th Cir. 2012).

The court must "review all of the evidence in the record," and "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (quoting 9B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2529 (3d ed. 1998)). Testimony is only "incredible as a matter of law" if "it relates to facts that the witness could not have possibly observed

6

or events that could not have occurred under the laws of nature." *United States v. Flores*, 572 F.3d 1254, 1263 (11th Cir. 2009) (cleaned up).

Because a Rule 50(b) motion is a renewed motion for judgment as a matter of law, "a district court can grant a Rule 50(b) motion only on grounds advanced in the preverdict Rule 50(a) motion." *McGinnis v. Am. Home Mort. Servicing, Inc.*, 817 F.3d 1241, 1260 (11th Cir. 2016) (cleaned up). "[B]ecause the rule is a harsh one, [the court] . . . take[s] a liberal view of what constitutes a motion for directed verdict." *Id.* at 1261 (cleaned up). The court may grant a Rule 50(b) motion on grounds that are "closely related" to those argued under Rule 50(a), such that setting aside a jury's verdict would not come as a surprise to the non-movant. *Id.*

Further, the court "does not have authority under Rule 50(b) to rule *sua sponte* on issues not raised by the parties." *Doe v. Celebrity Cruises, Inc.*, 394 F.3d 891, 903 (11th Cir. 2004); *see also Crawford v. Andrew Sys., Inc.*, 39 F.3d 1151, 1154 (11th Cir. 1994) ("Just as we would not permit defendants who had made no previous motion to ask the court to rule on the legal sufficiency of the evidence once a verdict had been returned against them, we cannot permit the district court to so rule *sua sponte*.").

## B. Rule 59 Standard

The court may grant a motion for a new trial under Rule 59(a) of the Federal Rules of Civil Procedure "when the verdict is against the clear weight of the evidence

or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (cleaned up). "[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Id.* (cleaned up).

Rule 59(e), on the other hand, permits the court to alter or amend a judgment. "The only grounds for granting a Rule 59 motion are newly-discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (cleaned up). "A Rule 59(e) motion cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Id.* (cleaned up). The court may not act *sua sponte* under Rule 59(e) once ten days have passed after the entry of judgment. *See Burnam v. Amoco Container Co.*, 738 F.2d 1230, 1232 (11th Cir. 1984) ("[S]o long as the court acts within ten days after the entry of judgment, the court has the power on its own motion to consider altering or amending a judgment.").

As applied to a motion for a remittitur under Rule 59(e), the court may reduce the jury's award where "the jury's damage award exceeds the amount established by the evidence." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1266 (11th Cir. 2008); *see also Moses v. K-Mart Corp.*, 905 F. Supp. 1054, 1057 (S.D. Fla.

1995) ("Of course, in reaching this determination the Court is not to substitute its judgment for the jury's, and where there is sufficient evidence in the record to support the award, the Court should not reduce merely because it would have found differently."). Where the jury's award "is for an identifiable amount that is not permitted by law," the court may "modify the jury's verdict to that extent and enter judgment for the correct amount." *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1330 (11th Cir. 1999); *see also id.* ("The Seventh Amendment is not offended by this reduction because the issue is one of law and not fact.").

## III. ANALYSIS

### A. ADA Disparate Treatment and Reasonable Accommodation Claims

#### 1. Disability

To prevail on a disparate treatment claim or a reasonable accommodation claim under the ADA, a plaintiff must first prove that he has a disability. *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016). "The term 'disability' means … a physical . . . impairment that substantially limits one or more major life activities of such individual; . . . a record of such an impairment; or . . . being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1).

Capstone first argues that it is entitled to judgment as a matter of law on Mr. McClinton's disparate treatment and reasonable accommodation claims because Mr. McClinton failed to establish a disability. Doc. 176 at 4. Specifically, it argues that

"[t]he medical record evidence presented at trial unequivocally established [Mr.] McClinton had no limitations on his ability to walk," and that "[Mr.] McClinton's testimony is the only evidence he was limited in walking." *Id*. at 6. Capstone further asserts that "a plaintiff's testimony, standing alone and contradicted by his medical records" is insufficient as a matter of law to establish a disability under the ADA. *Id*. at 7. Capstone argues not only that Mr. McClinton's testimony is insufficient generally, *see id*. at 7–12, but also that his testimony as a layperson cannot establish a medical causal link between his leg pain and his back condition, which Capstone asserts is required under the ADA, *see id*. at 13–14.

Capstone's arguments fail. Sufficient evidence was presented at trial to support the jury's finding that Mr. McClinton was disabled. First, the medical evidence did not "unequivocally establish" Mr. McClinton's lack of disability. Although the Fit for Duty Release form that Mr. McClinton's neurosurgeon, Dr. Chambers, completed on March 18, 2019, stated that Mr. McClinton was able to "[f]requently walk/stand 3 to 6 hours on concrete flooring," Doc. 156-13 at 1, it was possible for the jury to view that statement as being consistent with a substantial limitation in Mr. McClinton's ability to walk, as compared to most people in the general population. Likewise, the jury could have viewed the blank limitations field on the note from the Emergency Room as insignificant in the light of the fact that it

10

also recorded that Mr. McClinton had "leg pain" that had persisted for "1 [week]." *See* Doc. 156-15 at 14.

Second, as Capstone acknowledges, no binding precedent supports its arguments that Mr. McClinton's testimony is insufficient as a matter of law. *See* Doc. 176 at 7–11. Capstone cites only unpublished opinions of the Eleventh Circuit and published opinions of district courts or other courts of appeals, which are not binding. 11th Cir. R. Rule 36-2; *Georgia v. President of the U.S.*, 46 F.4th 1283, 1304 (11th Cir. 2022). The same deficit applies to Capstone's argument that the ADA requires expert evidence of medical causation. *See* Doc. 176 at 12–14.

Indeed, binding precedent counsels against granting the relief Capstone seeks. Binding precedent holds that whether an individual is disabled "should not require extensive analysis." *U.S. Equal Emp. Opportunity Comm'n v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1344 (11th Cir. 2016); *see also* 29 C.F.R. § 1630.2(j)(1)(iii). The term "substantially limits" is "not meant to be a demanding standard" and must be "construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA." 29 C.F.R. § 1630.2(j)(1)(i); *see also* 42 U.S.C. § 12102(4)(A).

Accordingly, there is no basis to disturb the jury's finding that Mr. McClinton had a disability, and Capstone's renewed motion for judgment as a matter of law on this ground fails.

## 2.  Qualified Individual

To prevail on a disparate treatment claim or a reasonable accommodation claim under the ADA, a plaintiff must also prove that he was a "qualified individual." *Frazier-White*, 818 F.3d at 1255. "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . . ." 42 U.S.C. § 12111(8).

"Whether a particular job function is essential is evaluated on a case-by-case basis by examining a number of factors." *Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1200–01 (11th Cir. 2014) (cleaned up). Relevant factors include: (1) whether "the position exists . . . to perform that function"; (2) whether there are a "limited number of employees available" to perform the function; (3) whether the function is "highly specialized so that the [employee] . . . is hired for his or her expertise or ability to perform the particular function; (4) "[t]he employer's judgment as to which functions are essential"; (5) "[w]ritten job descriptions"; (6) "[t]he amount of time spent on the job performing the function"; (7) "[t]he consequences of not requiring the [employee] to perform the function"; (8) "[t]he terms of a collective bargaining agreement"; (9) "[t]he work experience of past [employees] in the job." 29 C.F.R. § 1630.2(n)(2), (3); *see also Samson*, 746 F.3d at 1201.

Capstone makes three arguments that Mr. McClinton failed to establish that he was a qualified individual. The first relates to Mr. McClinton's request to use a cane or crutches on April 17, 2019. *See* Doc. 167 at 194, Tr. 350:10–15. The second relates to his request in early April for a "reduced schedule," *i.e.* to reduce some of his "extra" weekend hours, but not to go below his full-time 48-hour week schedule. *See* Doc. 187 at 16; Doc. 167 at 214, Tr. 370:19–21. The third relates to Dr. Chambers's Fit-for-Duty Release form that stated that Mr. McClinton could not perform certain tasks, such as frequently lifting items ranging in five to eighty pounds in weight for a sustained period of time. *See* Doc. 157-3. These arguments are not sufficient to disturb the jury's finding that Mr. McClinton was a qualified individual.

Capstone's first two arguments assert that Mr. McClinton failed to present medical evidence showing that the accommodations he requested were necessary, and that even if they were supported by medical evidence, they were not reasonable as a matter of law. *See* Doc. 176 at 18–23. Regarding the request to use crutches or a cane, Capstone argues that "[t]here was uncontradicted testimony that [it] could not be accommodated due to the nature of the worksite, including a dock area that was over two football fields long and that had powered industrial trucks, including forklifts and electric pallet jacks, operating constantly." *Id.* at 19–20. Regarding Mr. McClinton's request for a reduced schedule, Capstone argues that the request was

unreasonable because it was made during "container season," which Mr. Langley testified was the busiest time of the year, when taking time off was not possible. *See id*. at 23.

As an initial matter, Capstone cites no binding precedent for its assertion that a request for an accommodation must be supported by specific medical documentation. *See id*. at 19. Capstone cites *Stewart v. Happy Herman's Cheshire Bridge*, but that case did not hold that medical documentation was required for the specific accommodation requested. 117 F.3d 1278 (11th Cir. 1997). *Stewart* held simply that "a qualified individual with a disability is not entitled to the accommodation of her choice, but only to a reasonable accommodation." *Id*. at 1286 (cleaned up). And the court's assessment of reasonableness did not hinge on whether there was medical evidence in support of an accommodation. *See id.*

Further, there was sufficient evidence for the jury to find that Mr. McClinton's requests were reasonable. Mr. Fernandez testified that "[c]rutches on the dock are a hazard," Doc. 166 at 111, Tr. 111:12–13, and Mr. Langley testified that taking time off was not possible during "container season," *see* Doc. 167 at 32–33, Tr. 188:7–189:7, but the jury was free to disbelieve their testimony and believe Mr. McClinton's testimony instead. Mr. McClinton testified, for example, that "not only was there a wheelchair ramp outside [the Dollar General Warehouse], but there [was] also an employee that worked for Dollar General that was in the warehouse in

a wheelchair." Doc. 171 at 4, Tr. 416:5–8. Mr. McClinton also testified that he had to work weekend shifts in addition to his regular shift, whereas the day shift supervisor did not have to do so. *See* Doc. 167 at 189–90, Tr. 345:19–346:18.

Finally, Capstone argues that the physical tasks that Dr. Chambers's Fit-for-Duty Release form stated that Mr. McClinton could not perform were essential functions of his position, and that Mr. McClinton offered no evidence of any accommodation that would permit him to perform them. *See* Doc. 176 at 24–28. But this is not a basis to disturb the jury's finding that Mr. McClinton was a qualified individual. The form that Dr. Chambers signed was intended for an unloader, rather than a site supervisor, at Capstone. *See* Doc. 171 at 53, Tr. 465:2–4. Mr. McClinton testified that some of the physical tasks listed there were "a part of" his job duties as a site supervisor, *id.*, Tr. 465:5–8, but that testimony did not require the jury to find that they were an "essential function" of his position. And the fact that not all unloaders would show up to every shift, *see* Doc. 167 at 174–75, Tr. 330:24–331:15, does not require the jury to infer that Mr. McClinton's position changed from that of a site supervisor to an unloader. Moreover, Mr. Fernandez, Capstone's corporate representative, testified that after Mr. McClinton came back from back surgery, he was able to perform all eleven of the "principal accountabilities" of a site supervisor. Doc. 166 at 151–52, Tr. 151:5–152:21. To the extent that the jury credited Mr.

Fernandez's testimony, such testimony constitutes sufficient evidence that Mr. McClinton was a qualified individual.

Accordingly, Capstone's renewed motion for judgment as a matter of law on the ground that Mr. McClinton failed to establish that he was a qualified individual fails.

## B. ADA Retaliation Claim

To prevail on a retaliation claim under the ADA, the plaintiff must show that: "(1) [he] engaged in a statutorily protected expression, (2) [he] suffered an adverse employment action, and (3) there was a causal link between the two." *Frazier-White*, 818 F.3d at 1258.

Capstone argues that Mr. McClinton did not engage in activity protected by the ADA because the retaliation provision of the ADA protects only individuals who have "opposed any act or practice made unlawful by this chapter," and merely requesting an accommodation does not constitute "opposition." Doc. 176 at 32–33 (quoting 42 U.S.C. § 12203(a)). Capstone cites *Crawford v. Metropolitan Government of Nashville and Davidson City* for its discussion of the definition of "oppose" in the context of Title VII's anti-retaliation provision, but *Crawford* is silent as to whether a request for an accommodation may constitute a protected activity. 555 U.S. 271, 276 (2009). Moreover, the Eleventh Circuit held in *Frazier-White* that "[t]he first element [of an ADA retaliation claim] may be met by a request

for a reasonable accommodation." 818 F.3d at 1258; *see also Belgrave v. Publix Super Market, Inc.*, No. 22-13021, 2023 WL 3477790, at *4 (11th Cir. May 16, 2023) ("An employee participates in a protected activity when he makes 'a request for a reasonable accommodation.'") (quoting *Frazier-White*, 818 F.3d at 1258).

Accordingly, the relevant question is whether there was sufficient evidence to support a finding that Mr. McClinton made a request for reasonable accommodations, and the court already has so held. *See supra* Section III.A.2. There is thus no basis to disturb the jury's verdict in favor of Mr. McClinton on his ADA retaliation claim.

## C. FMLA Interference

### 1. Renewed Motion for Judgment as a Matter of Law

"The FMLA provides eligible employees the right to 12 weeks of leave for a serious health condition that makes the employee unable to perform the functions of her position." *Munoz v. Selig Enterprises, Inc.*, 981 F.3d 1265, 1274 (11th Cir. 2020); *see also* 29 U.S.C. § 2612(a)(1)(D). It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." 29 U.S.C. § 2615(a)(1).

"When an employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, that triggers the employer's obligation to evaluate whether the employee's requested absence in fact qualifies for FMLA protection."

*Ramji v. Hosp. Housekeeping Sys., LLC*, 992 F.3d 1233, 1243 (11th Cir. 2021). "The employer must also provide notice to the employee of [his] eligibility for and rights under the FMLA within a certain timeframe." *Id.*; *see also* 29 C.F.R. § 825.300(b)(1) ("[T]he employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances."). "A '[f]ailure to follow the notice requirements . . . may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights.'" *Ramji*, 992 F.3d at 1243 (quoting 29 C.F.R. § 825.300(e)).

To succeed on an interference claim, "a plaintiff must prove that [he] was denied a benefit to which [he] was entitled under the FMLA, and that, as a result, [he] was prejudiced in some way that is remediable by either damages or equitable relief." *Lapham v. Walgreen Co.*, 88 F.4th 879, 895–96 (11th Cir. 2023) (cleaned up). Monetary damages available under the FMLA fall into two categories. First, the FMLA awards damages equal to the amount of "any wages, salary, employment benefits, or other compensation denied or lost to [an] employee by reason of the [employer's] violation." 29 U.S.C. § 2617(a)(1)(A)(i)(I). Second, "in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee," the FMLA awards damages equal to the amount of "any actual monetary losses sustained by the employee as a direct result of the violation, such as

the cost of providing care, up to a sum equal to 12 weeks . . . of wages or salary for the employee." *Id*. § 2617(a)(1)(A)(i)(II).

Because the jury found in favor of Capstone on Mr. McClinton's FMLA retaliation claim, Capstone challenges only the jury's verdict as to the interference claim. Capstone raises four arguments. First, Capstone argues that "[Mr.] McClinton suffered no damages related to leave to recover from his back surgery" in February 2019. Doc. 176 at 38 (cleaned up). Second, Capstone argues that "[Mr.] McClinton suffered no damages related to his [three-day] leave in April 2019." *Id*. at 41 (cleaned up). Third, Capstone argues that "[Mr.] McClinton's statement [in April 2019] that he may need leave for a future surgery is legally insufficient to provide proper notice of need for FMLA leave." *Id*. at 42 (cleaned up). Fourth, Capstone argues that "[t]o the extent the jury entered a verdict for [Mr.] McClinton on the basis of his termination from employment constituting the FMLA interference, that claim is legally barred." *Id*. at 44.

It is only in a footnote to its reply brief that Capstone asserts that "the jury improperly sought to award [Mr.] McClinton compensatory or emotional distress damages for his FMLA interference claim in contravention of both the law and jury instructions." Doc. 191 at 6 n.3. Specifically, Capstone argues that the jury sought to award compensatory damages unavailable under the FMLA because $200,000 is "the exact amount awarded for emotional distress damages under the ADA," "over

four times the amount of [Mr.] McClinton's annual salary of $47,000," and "over ten times the amount of wages and benefits [Mr.] McClinton could have earned in twelve weeks pursuant to the FMLA." *Id*. at 6–7 n.3. The court declines to consider this argument. The Initial Order in this case cautioned the parties that the court "will not consider substantive arguments made in footnotes." Doc. 10 at 16 (cleaned up). And controlling precedent provides that "[a]rguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived." *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009).

Capstone identifies as Mr. McClinton's "first theory of recovery under his FMLA interference claim . . . that he was not provided FMLA leave while he was out of work from February 25, 2019 through March 25, 2019." Doc. 176 at 38. Capstone does not argue that Mr. McClinton's back problem did not constitute a serious health condition, or that Mr. McClinton failed to provide proper notice of need for FMLA leave before he had his back surgery in February 2019. *See id*. at 38–41. Mr. McClinton testified that he told Mr. Langley about the date of his back surgery, Doc. 167 at 184, Tr. 340:8–13, and Capstone does not challenge the sufficiency of that evidence. Capstone also does not argue that it informed Mr. McClinton of his eligibility for FMLA leave or provided the relevant paperwork. *See* Doc. 176 at 38–41. Mr. McClinton testified that he was "a bit ignorant" about the FMLA at the time and that Capstone did not provide him with any FMLA

paperwork. Doc. 167 at 187, Tr. 343:4–10. Capstone does not challenge the sufficiency of that evidence. *See* Doc. 176 at 38–41.

Capstone argues instead that Mr. McClinton was not prejudiced nor damaged because he "admitted at trial that he was paid his full salary" during the period from February 25, 2019 to March 25, 2019. *Id.* at 38; *see also* Doc. 171 at 48, Tr. 460:5–11. Capstone also cites Mr. McClinton's testimony that "he received short-term disability benefits on top of his salary for part of that time." Doc. 176 at 39 (cleaned up); *see also* Doc. 171 at 49–50, Tr. 461:17–462:1. Capstone argues that "[t]here was no evidence that [Mr.] McClinton suffered any financial or pecuniary harm at all related to his leave; indeed, quite the opposite: he made more during his leave than if he had been working." Doc. 176 at 41.

But Capstone ignores Mr. McClinton's testimony regarding the impact of his inability to take up to twelve weeks of FMLA leave on his recovery from back surgery. When asked about his shift on Sunday, April 14, 2019, Mr. McClinton testified that what he remembered was "being in extreme pain and very much difficulty getting around." Doc. 167 at 207, Tr. 363:5–6. Mr. McClinton further testified that the next day, he "could barely move," so that his wife "ended up taking [him] to the emergency room" and "wheeling [him] in a wheelchair." *Id.* at 191, Tr. 347:5–12; *see also* Doc. 156-15 at 14 (medical records of Mr. McClinton's visit to the Emergency Room on April 15, 2019). When asked if taking FMLA leave "would

21

have helped assist [his] pain," Doc. 167 at 207, Tr. 363:10–12, Mr. McClinton replied, "I think it would have helped. It would have given my back a bit more time to try to heal better and not working six and seven days a week, that would have been a big help." *Id*., Tr. 363:15–18; *see also id*. at 217, Tr. 373:15–17 (Mr. McClinton testifying to his belief that receiving FMLA leave would have been "helpful" to healing his back).

The jury could have credited Mr. McClinton's testimony and found that he was prejudiced and damaged by Capstone's failure to notify him of his right to FMLA leave after he informed them about his back surgery. Although Capstone characterizes Mr. McClinton's testimony regarding his recovery as "self-serving and unsupported speculation," Doc. 191 at 26, it does not assert, or cite any case law, that Mr. McClinton's testimony by itself is insufficient to establish prejudice or damages. *See* Doc. 176 at 38–41; Doc. 191 at 26–27.

Because there was sufficient evidence for the jury to find that Capstone's failure to notify Mr. McClinton of his FMLA rights in February 2019 prejudiced him in a way that was remediable by damages, it is unnecessary to address Capstone's other arguments for judgment as a matter of law on Mr. McClinton's FMLA interference claim. Capstone's renewed motion for judgment as a matter of law is **DENIED** as to Mr. McClinton's FMLA interference claim.

22

### 2. Motion for a New Trial

Capstone moves in the alternative for a new trial on Mr. McClinton's FMLA interference claim, "because the jury's verdicts on the FMLA interference and retaliation claims are inconsistent."[2] Doc. 176 at 46. Specifically, Capstone argues that the jury's answer to Question 3 on the verdict form for the FMLA interference claim is "inconsistent and irreconcilable" with the answer to Question 2 on the verdict form for the FMLA retaliation claim. *Id.*

Question 3 on the verdict form for the FMLA interference claim asks: "[Did] Mr. McClinton g[i]ve Capstone proper notice of his need for leave?" Doc. 162 at 11. Question 2 on the verdict form for the FMLA retaliation claim asks: "[Did] Mr. McClinton properly request[] FMLA leave?" *Id.* at 13. The jury answered "Yes" to the first question and "No" to the second. Capstone asserts that "[w]hile the language is slightly different—'gave proper notice' versus 'properly requested'—the difference in language is not substantive and is based on the same underlying jury instructions" regarding proper notice of need. Doc. 176 at 46.

"A verdict is inconsistent when there is no rational, non-speculative way to reconcile . . . two essential jury findings." *Reider v. Philip Morris USA, Inc.,* 793 F.3d 1254, 1259 (11th Cir. 2015) (cleaned up). "A district court must make all

---

[2] "A party must object to a verdict as inconsistent before the jury has been dismissed." *Reider v. Philip Morris USA, Inc.,* 793 F.3d 1254, 1259 (11th Cir. 2015). Capstone raised and preserved this argument. Doc. 169 at 124, Tr. 805:19–23.

reasonable efforts to reconcile an inconsistent jury verdict and if there is a view of the case which makes the jury's answers consistent, the court must adopt that view and enter judgment accordingly." *Id*. (cleaned up). "To determine whether a conflict in the verdict can be reconciled, a district court must ask whether the jury's answers could reflect a logical and probable decision on the relevant issues . . . submitted." *Id*. (cleaned up).

The jury's answers are consistent in light of a curative instruction that the jury received: "When you are considering whether Mr. McClinton's termination violated the FMLA, that is assessed under the retaliation instruction. Any other alleged violation of the FMLA is assessed under the interference instruction." Doc. 158-2 at 1. This instruction was proposed by Capstone, after Mr. McClinton's counsel stated in his closing argument that Capstone interfered with Mr. McClinton's FMLA rights by terminating him. *See* Doc. 169 at 101, Tr. 782:8–9; *id*. at 105, Tr. 786:12–17.

Given this instruction, the jury could have reasonably considered different time periods as to whether Mr. McClinton provided proper notice of his need for FMLA leave. The jury could have found that whereas Mr. McClinton provided proper notice of need before his back surgery in February 2019, he did not do so in April 2019, shortly before he was terminated. Indeed, in moving for judgment as a matter of law on Mr. McClinton's FMLA interference claim, Capstone argued only that Mr. McClinton's statement in April 2019 that "he may need a second back

surgery at some point in the future" was legally insufficient to provide proper notice of need for FMLA leave. Doc. 176 at 42. Capstone did not argue that Mr. McClinton failed to provide proper notice of need in February 2019.

Capstone's motion for a new trial is **DENIED**.

### D. Punitive Damages

Capstone argues that there was insufficient evidence to award punitive damages for Mr. McClinton's ADA claims on three separate grounds. First, Capstone argues that Mr. McClinton "did not introduce evidence of malice or reckless indifference to support a claim for punitive damages." Doc. 176 at 49. Second, Capstone argues that the alleged discriminator, Mr. Langley, was "not high up in Capstone's corporate structure." *Id*. at 53. Third, Capstone argues that its actions in good faith defeat punitive damages. *Id*. at 55.

To disturb the jury's award of punitive damages, the facts and inferences must point overwhelmingly in favor of Capstone such that reasonable people could not arrive at a contrary verdict. Capstone has not carried that burden. There was sufficient evidence for the jury to find that Mr. Langley acted with malice or reckless indifference to Mr. McClinton's federally protected rights under the ADA.

To support an award of punitive damages for intentional discrimination in employment—including violations of the ADA—the plaintiff must show that the employer "engaged in a discriminatory practice . . . with malice or with reckless

indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). "Malice means an 'intent to harm' and recklessness means 'serious disregard for the consequences of one's actions.'" *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1280 (11th Cir. 2008) (cleaned up). Although "mere negligence as to the civil rights of employees is not enough to justify punitive damages," "[a] jury may find reckless indifference where the employer does not admit that it knew that its actions were wrong." *U.S. Equal Emp. Opportunity Comm'n v. W&O, Inc.*, 213 F.3d 600, 611 (11th Cir. 2000). It is sufficient for the employer to "discriminate in the face of a perceived risk that its actions will violate federal law." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999).

Importantly, "an employer's conduct need not be independently 'egregious' to satisfy § 1981a's requirements for a punitive damages award, although evidence of egregious misconduct may be used to meet the plaintiff's burden of proof." *Id.* at 546. Conduct that could support a punitive damages award includes: "(1) a pattern of discrimination, (2) spite or malevolence, or (3) a blatant disregard for civil obligations." *Goldsmith*, 513 F.3d at 1280 (cleaned up). In *Brown v. Advanced Concept Innovations, LLC*, for example, the court held that there was sufficient evidence to support the jury's award of punitive damages by pointing to the following facts: the employer "made no attempt to provide a reasonable accommodation," and then "created documentation falsely suggesting that [the

plaintiff] had voluntarily resigned, rather than been terminated for not being able to perform the duties of the position." No. 21-11963, 2022 WL 15176870, at *5 (11th Cir. Oct. 27, 2022).

There was sufficient evidence for a reasonable jury to find that Mr. Langley acted with reckless indifference to Mr. McClinton's rights under the ADA. One of the most hotly disputed facts before trial was whether Mr. McClinton had falsified the Corrective Action Notice that he received, and Capstone terminated his employment for that reason. *See* Doc. 87 at 19. Mr. McClinton's testimony at trial was directly at odds with Mr. Langley's testimony. Mr. Langley testified that Mr. McClinton falsified the Corrective Action Notice by "chang[ing] the written [warning] to a verbal [warning] and the termination to a suspension," Doc. 167 at 150, Tr. 306:17–18, and that Mr. McClinton was terminated for falsifying that form. *See id*. at 46, Tr. 202:3–6. Mr. McClinton testified that when he met with Mr. Langley on April 18, 2019, regarding the Corrective Action Notice, Mr. Langley made those changes himself, because he agreed with Mr. McClinton that he should not be receiving a written warning without a verbal warning first. *See id*. at 197, Tr. 353:3–11; Doc. 171 at 63–64, Tr. 475:17–476:8.

There was sufficient evidence for the jury to find that Mr. Langley lied about Mr. McClinton's falsification of the Corrective Action Notice. And a reasonable jury was allowed to infer from the timing of events that Mr. Langley lied to create a

pretext for terminating Mr. McClinton on the basis of his disability: Mr. McClinton requested the use of a cane or crutches on April 17, which was immediately denied, *see* Doc. 167 at 194, Tr. 350:10–15; Mr. McClinton received the Corrective Action Notice on April 18; Mr. Langley purportedly "discovered" on April 19 that Mr. McClinton had falsified the form and contacted Mr. Fernandez about it. *See id*. at 48–49, Tr. 204:21–205:3. Mr. Langley also admitted that he was "the person that initiated the conversation to Mr. Fernandez to terminate Mr. McClinton." *Id*. at 45, Tr. 201:21–25.

Nevertheless, Capstone argues that punitive damages may not be imposed as a matter of law because Mr. Langley was not "high up in Capstone's corporate structure." Doc. 176 at 53. Capstone first posits that "it was [Mr.] Langley who informed [Mr.] Fernandez of the corrected action notice being falsified, and there was no indication that [Mr.] Fernandez either did not believe [Mr.] Langley or was part of a plot to terminate [Mr.] McClinton's employment for a false, discriminatory or retaliatory reason." *Id*. at 55. Capstone further asserts that Mr. Langley was a "mere site manager," a title held by over 600 other individuals. *Id*. at 54–55.

Capstone misunderstands the applicable legal standard. In *Dudley v. Wal-Mart Stores, Inc*., the Eleventh Circuit held that punitive damages may not be assessed absent a showing that "the discriminating employee was high up the corporate hierarchy, or that higher management countenanced or approved his

behavior." 166 F.3d at 1323 (cleaned up). Under this "higher management" standard, the court considers factors such as how many employees the discriminator oversees and how many employees occupy the same position as the discriminator. *See Equal Emp. Opportunity Comm'n v. Exel, Inc.*, 884 F.3d 1326, 1332 (11th Cir. 2018).

But in *Kolstad v. American Dental Association*, which was decided shortly after *Dudley*, the Supreme Court held that punitive damages may be imputed "where an employee serving in a 'managerial capacity' committed the wrong while 'acting in the scope of employment.'" 527 U.S. at 543 (quoting Restatement (Second) of Agency § 217 C (1957)). The Court explained that whether an employee served in a "managerial capacity" is a "fact-intensive inquiry" that involves consideration of "the type of authority that the employer has given to the employee, the amount of discretion that the employee has in what is done and how it is accomplished." *Id*. That is, "an employee must be 'important,' but perhaps need not be the employer's 'top management, officers, or directors,' to be acting 'in a managerial capacity.'" *Id*. (quoting 1 L. Schlueter & K. Redden, Punitive Damages, § 4.4(B)(2)(a), at 181 (3d ed. 1995)).

The Eleventh Circuit has recognized the "apparent conflict" between the standards in *Dudley* and *Kolstad*, and held that it remains bound by the "higher management" standard in *Dudley* based on the prior panel precedent rule. *Exel*, 884

F.3d at 1332. Capstone now cites *Exel* to support its argument that *Dudley* bars punitive damages in this case. *See* Doc. 176 at 53 n.7.

But Capstone waived this argument. The jury was instructed that "Mr. McClinton must show that an employee of Capstone, acting in a managerial capacity, either acted with malice or with reckless indifference to Mr. McClinton's federally protected rights." Doc. 158-1 at 17. After informing the jury that "[t]here is no bright-line rule about which employees act in a managerial capacity[,]" the instructions continued, "You must determine whether an employee acted in a 'managerial capacity' based upon the type of authority Capstone gave the employee and the amount of discretion that the employee has in what is done and how it is accomplished." *Id*. at 17–18. In other words, the jury was instructed to evaluate whether the discriminator, *i.e.* Mr. Langley, acted in a "managerial capacity," not whether he was "high up in Capstone's corporate hierarchy."

Capstone never objected to these instructions. *See* Doc. 167 at 230, Tr. 386:6–10; *id*. at 238, Tr. 394:9–11; *id*. at 242, Tr. 398:4–15; *id*. at 244, Tr. 400:16–24; *id*. at 246, Tr. 402:13–16; Doc. 168 at 123–24, Tr. 665:15–666:5; Doc. 169 at 4–5, Tr. 685:22–686:24; *id*. at 9, Tr. 690:5–9 (raising other objections). Indeed, Capstone proposed (jointly with Mr. McClinton) the instructions referring to "managerial capacity." In the parties' joint proposed jury instructions, the parties adopted the Eleventh Circuit Pattern Jury Instructions referring to "managerial capacity" in full,

without any disputed portions. *Compare* Doc. 142 at 34–35; Pattern Civ. Jury Instr. 11th Cir. 4.11–4.13 (2022). Accordingly, the court will not find the instruction erroneous and if there were error, Capstone invited it. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1331 (11th Cir. 1999).

Finally, Capstone's argument that it established a good faith defense under *Kolstad* also fails. Mr. McClinton developed sufficient evidence for a reasonable jury to find that Capstone did not establish a good faith defense. "[I]n the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." *Kolstad*, 527 U.S. at 545 (cleaned up); *see also Merard v. Magic Burgers, LLC*, No. 21-12037, 2022 WL 3023213, at *4 (11th Cir. Aug. 1, 2022) (applying *Kolstad*'s good-faith defense for punitive damages awarded for ADA claims). Capstone cites *Ash v. Tyson Foods, Inc.* for its holding that good faith efforts may include "a written company policy forbidding racial and other unlawful types of discrimination, communication of that policy to all decision makers and other employees, and training on the policy." 664 F.3d 883, 904 (11th Cir. 2011). But this case is unlike *Ash*, where the court held that evidence of good faith was "overwhelming, uncontradicted, and undisputed." *Id*. at 905.

In *Ash*, the employer not only had a written "Equal Employment Opportunity, Fair Employment Practice, Personnel Policy," but it also supplemented that with an "additional written policy titled 'Management Standards of Behavior.'" *Id.* at 904–905.  The employer enforced that policy by "conducting yearly training sessions with all management personnel regarding [the] policy"—there was testimony by the Human Resources manager that she had conducted such training for "twenty years." *Id.* at 905. It was "undisputed that [the discriminator] himself was well aware of [the employer's] policy prohibiting racial and other forms of unlawful discrimination in promotion and other decisions." *Id.*

By contrast, Capstone's written antidiscrimination policy amounted to two paragraphs contained in the employee handbook, under the heading of "Equal Employment Opportunity." *See* Doc. 156-1 at 10. Evidence regarding its enforcement or efficacy was also not overwhelming in the way it was in *Ash*. When asked what kind of training Capstone provided on employment discrimination to its employees, Mr. Fernandez answered, "Basically, it's what's in the handbook. [P]art of orientation is covering these types of subjects . . . . And then beyond that, we're instructed that anything even remotely possible rises to the level of harassment or discrimination, we should immediately get with our HR department." Doc. 166 at 85, Tr. 85:4–10.

As to what was covered at orientation, Mr. Langley testified that he could not remember receiving any training about antidiscrimination policies. *See* Doc. 167 at 21, Tr. 177:23–25. What he did recall were "things from the handbook, really concentrated on safety, quality, housekeeping, performance of associates, how associates were paid and just general training." *Id.*, Tr. 177:15–18.

Such evidence was sufficient for reasonable jurors to differ as to whether Capstone's written policy was effective. *See Goldsmith*, 513 F.3d at 1281–82. Capstone's motion for judgment as a matter of law on punitive damages is therefore **DENIED.**

### E. Remittitur

In its motion for a remittitur in the alternative, Capstone moved only for a remittitur of damages for Mr. McClinton's ADA claims; Capstone did not move for a remittitur of damages for Mr. McClinton's FMLA interference claim. *See* Doc. 176 at 57–71. Capstone's motion for a remittitur is **GRANTED IN PART** and **DENIED IN PART**.

#### 1. Statutory Cap

First, Capstone argues that Mr. McClinton's compensatory and punitive damages for all his ADA claims must be capped to a total of $300,000. Doc. 176 at 57. The court agrees.

Section 1981a(b)(3) limits the sum of compensatory and punitive damages that "each complaining party" bringing an action under the ADA may recover. Depending on the number of employees the defendant has, "[t]he sum of the amount of compensatory damages awarded . . . for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded" may not exceed the established amount. 42 U.S.C. § 1981a(b)(3); *see also id*. § 1981a(b)(2) ("Compensatory damages awarded under this section shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964."). Where the defendant has more than "500 employees," the sum of compensatory and punitive damages may not exceed "$300,000," which is the largest of the four caps provided. *Id*. §1981a(b)(3)(D).

Capstone asserts that the jury's award of compensatory and punitive damages must be capped at $300,000 in this case, not because it has established that it has more than 500 employees, but because that is the maximum recovery that the statute allows under any circumstances. *See* Doc. 176 at 57–60. Mr. McClinton responds that Capstone should be "judicially estopped from raising statutory caps for the first time" in its motion for a remittitur. Doc. 187 at 35. Specifically, Mr. McClinton asserts that the issue of statutory caps does not appear as an affirmative defense in either Capstone's answer to the second amended complaint, *see* Doc. 36, or the

pretrial order, *see* Doc. 101. Mr. McClinton further asserts that Capstone did not oppose his motion *in limine* to preclude Capstone from raising at trial new defenses not contained within the pretrial order. *See* Doc. 114 at 3.

The question is whether the issue of statutory caps under section 1981a(b)(3) is an affirmative defense. If it is, Capstone's failure to plead it in the answer is fatal, because "[f]ailure to plead an affirmative defense generally results in a waiver of that defense." *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010); *see also* Fed. R. Civ. P. 8(c)(1) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . .").

In the absence of binding authority that holds that section 1981a(b)(3) provides an affirmative defense, the court will not decline to enforce the statutory cap. Congress did not identify 1981a(b)(3) as an affirmative defense, and the Eleventh Circuit has not interpreted it as an affirmative defense. Indeed, the only case that Mr. McClinton cites in support of his treatment of section 1981a(b)(3) as an affirmative defense is an unpublished district court opinion. *See Whitford v. Sub-Line Assocs., Inc.*, CV-15-BE-1678-S, 2017 WL 3118810, at *12 (N.D. Ala. July 21, 2017).

Moreover, because Section 1981a(c)(3) expressly requires the court to "not inform the jury of the limitations described in subsection (b)(3)," the jury received no instructions regarding the statutory cap, which means that Capstone is not running

into any barrier imposed by its failure to object to Mr. McClinton's motion *in limine* nor impermissibly using Rule 59(e) to raise new legal theories or arguments "that contradict verdict forms or instructions that the moving party proposed to the district court." *St. Joseph's Hosp.*, 842 F.3d at 1349. The statutory cap is, by design, meant to reduce damages after the jury has awarded what it found to be appropriate. *See Warren v. Cnty. Comm'n of Lawrence Cnty.,* 826 F. Supp. 2d 1299, 1306 (N.D. Ala. 2011) ("[T]he cap [under 42 U.S.C. § 1981a(b)(3)] is for the Court, not the jury to apply . . . .").

Notably, the $300,000 statutory cap applies to this entire action, not Mr. McClinton's individual claims. *See id.* at 1305 ("The cap [under 42 U.S.C. § 1981a(b)(3)] applies to each individual prevailing plaintiff, rather than to each individual claim."); *Hudson v. Chertoff,* 473 F. Supp. 2d 1286, 1289 (S.D. Fla. 2007) (collecting cases and ruling: "The circuit courts that have addressed the issue consistently have held that the statutory cap [under 42 U.S.C. § 1981a(b)(3)] applies per party or action, not per claim."). Section 1981a(a)(2) provides that "[i]n an action brought by a complaining party under . . . [the ADA], the complaining party may recover compensatory and punitive damages as allowed in subsection (b) . . . ." Subsection (b), in turn, provides that the "sum of the amount of compensatory damages . . . and the amount of punitive damages . . . for each complaining party" is subject to the listed caps.

36

Mr. McClinton cites no case to support his suggestion that, despite the plain language and persuasive precedent, the cap should apply to each claim rather than the entire action. *See* Doc. 187 at 37. Accordingly, Capstone's motion to reduce the jury's award of compensatory and punitive damages for all three ADA claims to a total of $300,000 is **GRANTED**.

### 2.  Multiple Awards of Backpay

The ADA authorizes this court to award equitable relief, including backpay, to prevailing plaintiffs. *See* 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(g)(1) (authorizing "reinstatement or hiring of employees, with or without back pay . . . or any other equitable relief as the court deems appropriate"). "[B]ackpay is not an automatic or mandatory remedy" under 42 U.S.C. § 2000e-5(g). *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415 (1975); *see also Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1184 (11th Cir. 2010) ("Backpay in [the Eleventh] Circuit is considered equitable relief . . . ."). "So long as the equitable remedy chosen is consistent with the statutory purpose[] of the ADA . . . , the trial court has broad discretion in fashioning relief." *Farley*, 197 F.3d at 1338 (cleaned up). The central purpose of the ADA "is to make the plaintiff whole, to restore the plaintiff to the economic position the plaintiff would have occupied but for the illegal discrimination of the employer." *Id.* (cleaned up).

At closing arguments, Mr. McClinton's counsel told the jury that Mr. McClinton was owed $249,614 in backpay from the date of his termination to the date of the verdict. Doc. 169 at 72, Tr. 753:19–21. Mr. McClinton's counsel then stated that with compounding quarterly interest, "total backpay for lost wages and benefits" was $272,000. *Id*., Tr. 753:22–25. The jury found $272,000 should be awarded in backpay for each of Mr. McClinton's ADA claims. Doc. 162 at 4, 7, 9.

Capstone argues that Mr. McClinton is "not entitled to multiple recovery for backpay." Doc. 176 at 60. The court agrees. The purpose of backpay is to restore Mr. McClinton to the economic position that he would have occupied but for the illegal discrimination by Capstone. Three identical awards of backpay result in a windfall to Mr. McClinton, rather than making him whole. Capstone's motion for a remittitur on this ground is **GRANTED**.

### 3.  Reduction of Backpay

Capstone asserts three separate and independent grounds for why the jury's calculation of backpay must be reduced from $272,000. First, it argues that backpay must, at a minimum, be reduced to $249,614 to "account for improperly included prejudgment interest." *Id*. at 62. Second, it argues that backpay must be reduced to $73,548.25 to account for Mr. McClinton's "clear failure to mitigate his damages from [September 17, 2020.]" *Id*. at 67. Third, it argues that backpay must be reduced to $176,065.75 because it "proved without contradiction that [Mr.] McClinton would

not have remained employed with Capstone past February 2022" due to the shutdown of its operations in Bessemer, Alabama. *Id*. at 70. The court reserves the issue of prejudgment interest on backpay for Mr. McClinton's motion to alter or amend the final judgment. *See infra* Section III.F.1. Capstone's motion to reduce backpay on the other two grounds, however, is **DENIED**.

The jury made a finding that Capstone failed to establish its affirmative defense that Mr. McClinton failed to mitigate damages. Jury instructions for each of Mr. McClinton's ADA claims stated: "If you find that Capstone proved . . . that Mr. McClinton failed to mitigate damages, then you should reduce the amount of Mr. McClinton's damages by the amount that could have been reasonably realized if Mr. McClinton had taken advantage of an opportunity for substantially equivalent employment." Doc. 158-1 at 17; *see also id*. at 24–25, 37–38. Specifically, the jury was instructed to determine whether "(1) work comparable to the position Mr. McClinton held with Capstone was available, and (2) Mr. McClinton did not make reasonably diligent efforts to obtain it." *Id*. at 16.

Although the jury did not have to answer "Yes" or "No" regarding the mitigation of damages in the verdict form, the jury's calculation of $272,000 in backpay necessarily reflects a finding that Mr. McClinton did not fail to mitigate damages. As Capstone points out, Mr. McClinton's counsel stated during closing arguments that $272,000 was the total backpay that Mr. McClinton was owed from

the date of termination to the date of verdict, plus interest. *See* Doc. 176 at 62–63; Doc. 169 at 72, Tr. 753:8–25. The jury found that Mr. McClinton should be awarded that amount, without any reduction.

As such, Capstone's request for a remittitur based on Mr. McClinton's failure to mitigate damages is in substance a motion for judgment as a matter of law on that ground—one that this court may grant only if, viewing the evidence in the light most favorable to Mr. McClinton, facts and inferences overwhelmingly supported a finding that Mr. McClinton failed to mitigate damages. But the evidence is not so one-sided.

Capstone's argument about Mr. McClinton's "clear failure to mitigate damages" rests on a narrow set of circumstances: that Mr. McClinton did not respond to an email sent by Alecia LaFon, the Vice President of Human Resources and Compliance for McPherson Oil, exploring his interest in work as a second shift warehouse supervisor. *See* Doc. 157-19 at 8; Doc. 168 at 92–95, Tr. 634:3–637:12. According to Capstone, the second shift supervisor position was comparable, if not better, than his previous position, and Mr. McClinton "would have been in the leading position to obtain the job" if he had only responded, Doc. 176 at 67, because Ms. LaFon testified that the position was "very difficult" to fill. Doc. 168 at 97, Tr. 639:7–10.

As an initial matter, the court is not inclined to upset the jury's verdict on the basis of Capstone's argument that Mr. McClinton failed to respond to one email about one job offer. The jury was not required to view the evidence about that email in isolation, as Capstone now presents it. Mr. McClinton testified that he applied to over 500 positions since he was terminated, and that he never turned down a job during that process. *See* Doc. 171 at 10, 422:12–25; Doc. 156-18 (confirmation pages for job applications that Mr. McClinton submitted online). Indeed, the reason why Ms. LaFon emailed Mr. McClinton about the second shift supervisor position was because he had applied to the position as a first shift supervisor, which had already been filled. *See* Doc. 157-19 at 8. The jury was not required to take the view of Ms. LaFon's testimony that Capstone takes.

Capstone's separate argument that backpay must be reduced because Mr. McClinton would not have retained his position past February 2022 is waived. Capstone asserts that there was uncontradicted evidence at trial regarding the end of its operations, including testimony that none of the employees at the Bessemer warehouse stayed with the company. Doc. 176 at 68–70. But the jury was not asked to determine whether Mr. McClinton would have been retained past February 2022 and to calculate backpay to that date, instead of the date of the verdict, if it made such a finding. Based on the parties' jointly proposed jury instructions, the jury was instructed to consider the "net lost wages and benefits from the date Capstone

41

terminated Mr. McClinton to the date of your verdict." *E.g.*, Doc. 158-1 at 15; *see also* Doc. 142 at 32 (the parties' joint proposal to instruct the jury to consider the "net lost wages and benefits from the date Capstone discharged his employment to the date of your verdict"). And based on the parties' proposals, the verdict form asked the jury whether "Mr. McClinton should be awarded damages to compensate for a net loss of wages and benefits to the date of your verdict[.]" *E.g.*, Doc. 162 at 3; *see also* Doc. 144 at 5 (Capstone's proposed verdict form asking whether "Mr. McClinton should be awarded damages to compensate for a net loss of wages and benefits to the date of your verdict"). Capstone never raised any objections after proposing such language.

The circumstances liken this case to *Collins v. Koch Foods, Inc*., where the Eleventh Circuit held that the defendant had waived the issue of whether backpay should be cut off as of the date that the plaintiff's employment would have been terminated anyway. No. 20-13158, 2022 WL 1741775, at *5 (11th Cir. May 31, 2022). Like Capstone, the defendant in *Collins* "did not object to the special verdict form or to the district court's jury instruction . . . both of which explicitly instructed the jury that compensatory damages for lost net wages and benefits should be awarded 'to the date of your verdict.'" *Id*. It had, in fact, "proposed this language." *Id*. As such, the court held that the district court abused its discretion in reducing the amount of backpay the jury awarded. *See id*.

42

Accordingly, Capstone's motion for a remittitur is granted solely to the extent that the sum of compensatory and punitive damages awarded in this action (excluding backpay) must not exceed $300,000, and Mr. McClinton may not recover backpay more than once.

### F.  Mr. McClinton's Motion to Alter or Amend the Final Judgment

In his motion to alter or amend the final judgment, Mr. McClinton requests multiple forms of equitable relief. Doc. 180. First, Mr. McClinton moves to keep the amount of backpay that the jury found he should be awarded, which includes prejudgment interest. *Id*. at 2. Second, Mr. McClinton moves for reinstatement to his position, or front pay in the alternative. *Id*. at 8–9. Third, Mr. McClinton requests interest on his damages award for his FMLA interference claim, in addition to liquidated damages under the FMLA. *Id*. at 5, 13.

#### 1.  Backpay with Prejudgment Interest

"In determining whether to award prejudgment interest, courts take into account both the failure to mitigate damages and whether the back pay amount is easily ascertainable." *Tucker v. Hous. Auth. of Birmingham Dist.*, 507 F. Supp. 2d 1240, 1284 (N.D. Ala. 2006).

Mr. McClinton argues that "[i]n order to make [him] whole and adjust the back pay award for inflation and reflect the present day value of income that should have been paid to him, this [c]ourt should exercise its discretion to award

43

prejudgment interest as calculated by the jury."[3] Doc. 180 at 3. Capstone responds that the court should not exercise its discretion to award prejudgment interest on Mr. McClinton's backpay, because Mr. McClinton "clearly failed to mitigate damages" and "Capstone ceased operations at the site where [Mr.] McClinton worked in February 2022." Doc. 188 at 2. Capstone does not argue that the amount of backpay is not easily ascertainable. *See id*. at 1–2.

As held above, there was sufficient evidence to support the jury's finding that Capstone failed to establish its failure-to-mitigate affirmative defense. *See supra* Section III.E.3. The court also rejected Capstone's argument that Mr. McClinton's backpay must be reduced because he would not have retained his position past February 2022. *Id*. An award of backpay with prejudgment interest is an appropriate equitable remedy to make Mr. McClinton whole and to compensate him for the value of money he lost over time due to Capstone's discriminatory acts. Accordingly, Mr. McClinton's motion for a backpay award of $272,000, which includes prejudgment interest, is **GRANTED**.

## 2. Reinstatement or Front Pay

---

[3] Mr. McClinton attached an "Backpay, Benefits and Interest Calculation for the ADA Claims" as an exhibit to his motion to alter or amend the final judgment, which states that the total backpay with interest as of June 2023 is $272,994.80. Doc. 180-1 at 4. Mr. McClinton makes no argument that this figure, instead of $272,000, is the total backpay award that he seeks. *See* Doc. 180 at 2–5. In any event, the award of backpay and prejudgment interest is left to the "broad discretion" of the court. *Farley*, 197 F.3d at 1338.

Mr. McClinton "seeks reinstatement to . . . his full-time, second-shift supervisor position paying at least $47,096.66 within a 45 mile area of Birmingham, Alabama." Doc. 180 at 9. Mr. McClinton requests front pay in the alternative, "[i]f reinstatement is unavailable due to Defendant being unwilling, it being unfeasible, or the employment relationship is damaged beyond repair." *Id.*

Although this court "presume[s] that reinstatement is the appropriate remedy in a wrongful discharge case, when extenuating circumstances warrant, a trial court may award a plaintiff front pay in lieu of reinstatement." *W&O, Inc.*, 213 F.3d at 619 (cleaned up). One such extenuating circumstances is a situation "where discord and antagonism between the parties would render reinstatement *ineffective* as a make-whole remedy." *Farley*, 197 F.3d at 1339 (cleaned up). But "the presence of some hostility between parties, which is attendant to many lawsuits, should not normally preclude a plaintiff from receiving reinstatement." *Id.* "Defendants found liable of intentional discrimination may not profit from their conduct by preventing former employees unlawfully terminated from returning to work on the grounds that there is hostility between the parties." *Id.* "Front pay [is] a special remedy, warranted only by egregious circumstances." *Lewis v. Fed. Prison Indus., Inc.*, 953 F.2d 1277, 1281 (11th Cir. 1992).

Capstone argues that reinstatement is not feasible because, based on Mr. Fernandez's affidavit signed August 24, 2023, "there are currently no supervisor

positions available within a 45-mile radius of Birmingham, Alabama." Doc. 188 at 6; *see also* Doc. 188-1 ¶ 10. But neither party cites controlling precedent that the present lack of vacancy is sufficient by itself to make reinstatement inappropriate. *See* Doc. 180 at 8–13; Doc. 188 at 5–8. In cases where the district court considered the fact that there was no vacancy in which to place the plaintiff, the court found other factors that made reinstatement inappropriate, such as discord and antagonism between the plaintiff and the supervisor that the plaintiff would have to work with closely, or an appearance of a conflict of interest. *See Tucker,* 507 F. Supp. 2d 1240; *Warren*, 826 F. Supp. 2d at 1307–08; *LaFleur v. Wallace State Cmty. Coll.*, 955 F. Supp. 1406 (M.D. Ala. 1996).

In *LaFleur*, for example, the court found that "if reinstated, the plaintiff would have to work closely with [an official], one of the individuals against whom the plaintiff has accused of race discrimination." 955 F. Supp. at 1426. Having also found that official to harbor resentment against the plaintiff, the court expressed concern that such "resentment could very likely lead to an antagonistic relationship." *Id*. Similarly, in *Tucker*, the court found antagonism between the plaintiff and an individual who "would still supervise Plaintiff if he were rehired." 507 F. Supp. 2d at 1281–82. The court also found that their antagonism went beyond mere "hostility common to litigation." *Id*. at 1282 (cleaned up). And in *Warren*, the court found that

there could be an "appearance of a conflict of interest if Plaintiff were to be reinstated." 826 F. Supp. 2d at 1308.

These problems do not exist for Mr. McClinton. Because Mr. Langley no longer works for Capstone, there is no cause for concern that Mr. McClinton may be worse off because he would have to work closely with Mr. Langley upon being reinstated. Doc. 167 at 18, Tr. 174:12–14 (Mr. Langley testifying that he now works for Amazon). And Capstone's assertion that its relationship with Mr. McClinton is "damaged beyond repair" because it "disagrees with the jury's verdict in full" and "stands by its position throughout this case that [Mr.] McClinton was fired after he falsified his own disciplinary document," Doc. 188 at 7, is insufficient to make reinstatement inappropriate. *See Farley*, 197 F.3d at 1339–40 ("[T]he presence of some hostility between parties, which is attendant to many lawsuits, should not normally preclude a plaintiff from receiving reinstatement. . . . To deny reinstatement on these grounds is to assist a defendant in obtaining his discriminatory goals."). Accordingly, Mr. McClinton's motion for reinstatement is **GRANTED**. The motion for front pay is **DENIED** as moot.

### 3. Interest on FMLA Award of Damages as well as Liquidated Damages

The FMLA provides that any employer who violates the Act "shall be liable to any eligible employee" for three different amounts. 29 U.S.C. § 2617(a)(1). First, the employer is liable for damages equal to the amount of "any wages, salary,

employment benefits, or other compensation denied or lost to [the] employee," or "any actual monetary losses sustained by the employee as a direct result of [the employer's] violation . . . up to a sum equal to 12 weeks . . . of wages or salary for the employee." *Id*. § 2617(a)(1)(A)(i). Second, the employer is liable for "the interest on the amount [of damages] calculated at the prevailing rate." *Id*. §2617(a)(1)(A)(ii). Third, the employer is liable for

> an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii), except that if an employer who has violated [the FMLA] proves to the satisfaction of the court that the act or omission [in violation] was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of [the FMLA], such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively.

*Id*. § 2617(a)(1)(A)(iii).

The jury awarded $200,000 in damages for Mr. McClinton's FMLA interference claim. Doc. 162 at 12. Mr. McClinton seeks interest on that award as well as liquidated damages equal to the sum of the jury's award and interest on that award. Doc. 180 at 5, 13.

Regarding Mr. McClinton's motion for interest, Capstone responds that there is "no 'backpay' to which interest would apply," because Mr. McClinton received his full salary and short-term disability while he was on leave from February 25, 2019, to March 25, 2019. Doc. 188 at 3. Capstone further asserts that "the jury sought to award [Mr.] McClinton compensatory damages plainly unavailable under the

FMLA." *Id*. at 4. That is, Capstone asserts that the jury's award of $200,000 in damages for FMLA interference is "the exact amount awarded for emotional distress damages under the ADA," "over four times the amount of [Mr.] McClinton's annual salary of $47,000," and "over ten times the wages and benefits Mr. McClinton could have earned in twelve weeks pursuant to the FMLA." *Id*. Capstone argues that "even if the FMLA interference damages were reduced to twelve weeks of lost wages and benefits, this would result in an impermissible quadruple-recovery of any wages/interest as a result of [Mr.] McClinton's brief absence from February 25 to March 25, 2019." *Id*.

As for Mr. McClinton's request for liquidated damages, Capstone reiterates its arguments that "[Mr.] McClinton's FMLA interference claim fails as a matter of law, and he suffered no damages from his one month and three days of paid leave in February, March, and April 2019." *Id*. at 18 (cleaned up). Capstone argues that "[Mr.] McClinton improperly seeks liquidated damages based upon [its] decision to terminate his employment . . . despite the Court's prior ruling that FMLA interference cannot be based on termination of employment." *Id*. at 19. Capstone also argues that "it simply cannot be the case that [it] failed to act in good faith" because "[Mr.] McClinton never submitted a Leave of Absence request form so as to properly request FMLA leave for his surgery in February 2019." *Id*. at 19–20. The only evidence that Capstone cites in support of this assertion is the jury's answer to

Question 2 for Mr. McClinton's FMLA **retaliation** claim. *See id.* at 19 n.3. To the question, "[Did] Mr. McClinton properly request[] FMLA leave," the jury answered, "No." Doc. 162 at 13.

The court has already denied Capstone's renewed motion for judgment as a matter of law on Mr. McClinton's FMLA interference claim. As held above, there was sufficient evidence for the jury to find that Mr. McClinton was prejudiced by Capstone's failure to notify him of his right to FMLA leave in February 2019, and that such failure resulted in actual losses other than the loss of wages and benefits. *See supra* Section III.C.1. To the extent Capstone asserts that the jury impermissibly awarded more than a sum equal to twelve weeks of wages, Capstone did not move for a remittitur to reduce the jury's award on Mr. McClinton's FMLA interference claim. The court may not act *sua sponte* in this case to grant a remittitur under Federal Rule of Civil Procedure 59(e). *See Burnam*, 738 F.2d at 1232.

Capstone has not established that its failure to notify Mr. McClinton of his right to FMLA leave in February 2019 was in good faith and that it had reasonable grounds for believing that omission was not a violation of the FMLA. The jury's answer that Capstone cites for its assertion that "[Mr.] McClinton never submitted a Leave of Absence request form so as to properly request FMLA leave for his surgery in February 2019" was neither in response to a question specifically about February 2019 nor about submission of a Leave of Absence request form. Doc. 188 at 19.

Capstone also ignores that for the relevant claim at issue—FMLA interference—the jury answered "Yes" to the question, "[Did] Mr. McClinton g[i]ve Capstone proper notice of his need for leave?" Doc. 162 at 11.

As explained above, Mr. McClinton testified that he told Mr. Langley about his upcoming back surgery. Doc. 167 at 184, Tr. 340:6–15. Mr. McClinton also testified that after the back surgery, he spoke to Human Resources at Capstone about the surgery. *Id.* at 186, Tr. 342:1–15. Capstone was thus sufficiently notified of his need for FMLA leave based on his back surgery in February 2019. *See White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1196 (11th Cir. 2015) ("As a general rule, an employee need not explicitly mention the FMLA when giving notice to her employer."). It cites no evidence to show that its failure to notify Mr. McClinton of his rights was in good faith or based on a reasonable belief that the omission was not a violation of the FMLA.

Accordingly, Mr. McClinton's motion for interest on the damages award, as well as liquidated damages for his FMLA interference claim is **GRANTED**.

### G. Attorney's Fees and Expenses

In an ADA suit, "the court . . . in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs." 42 U.S.C. § 12205. The FMLA provides that the court "shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness

fees, and other costs of the action to be paid by the defendant." 29 U.S.C. § 2617(a)(3).

"A reasonable attorney's fee . . . is calculated 'by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Caplan v. All Am. Auto Collision, Inc*., 36 F.4th 1083, 1089 (11th Cir. 2022) (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). "The sum of this calculation is often called the 'lodestar.'" *Id*. (cleaned up).

## 1. Reasonable Hourly Rate

"A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988). "The applicant bears the burden of producing satisfactory evidence that the requested rate is in line with prevailing market rates." *Id*.

Whereas Mr. McClinton has requested a rate in the range of $350 to $375 per hour, *see* Doc. 196 at 2, Capstone argues that Mr. McClinton's counsel's hourly rates should be no more than $300 per hour given their level of experience. *See* Doc. 189 at 3; Doc. 178-1 at 2 (affidavit of Blake Edwards declaring that he has been practicing law since 2015); Doc. 178-2 at 3 (affidavit of Nicole Edwards declaring that she has been practicing law since 2015). The court disagrees. Mr. McClinton

satisfied the burden of showing that a rate of $350 per hour is in line with prevailing market rates.

Mr. McClinton submitted affidavits of attorneys practicing in the state of Alabama as plaintiffs' lawyers in the field of employment discrimination. *See* Doc. 178-6; *Norman*, 836 F.2d at 1299 ("Satisfactory evidence at a minimum is more than the affidavit of the attorney performing the work."). Three of them declared that the "prevailing hourly rates for lawyers handling plaintiff's employment cases range from $375 an hour to $650 per hour depending on the skill of the litigator." Doc. 178-6 at 9, 20, 25. One declared that the prevailing hourly rates ranged from $350 to $650. *See id*. at 35. Another declared that the range was $300 to 650. *See id*. at 42. The last declared that the range was $325 to $850. *See id*. at 53. When taking the average of the lower ends of these ranges, a rate of $350 is in line with prevailing market rates. The most recent of the cases that Capstone cites for attorney's fees is from 2020, where an attorney with thirteen years' experience received $250 per hour, *see Mercer v. Ala. Dep't of Transp*., No. 2:16-cv-01204-RDP, 2020 WL 5229519, at *2 (N.D. Ala. Sept. 2, 2020), but it points to no evidence to contradict declarations regarding "significant inflation since the pandemic." Doc. 178-6 at 21.

## 2. Reasonable Hours

"The next step in the computation of the lodestar is the ascertainment of reasonable hours." *Norman*, 836 F.2d at 1301. "[E]xcessive, redundant or otherwise

unnecessary hours should be excluded from the amount claimed" to encourage fee applicants to exercise billing judgment. *Id.* (cleaned up). "[T]he measure of reasonable hours is determined by the profession's judgment of the time that may be conscionably billed and not the least time in which it might theoretically have been done." *Id*. at 1306. "The court, either trial or appellate, is itself an expert on the question [of reasonable fees] and may consider its own knowledge and experience concerning reasonable and proper fees . . . ." *Id*. at 1303 (cleaned up).

The Eleventh Circuit has highlighted several principles for what constitute excessive, redundant, or unnecessary hours. First, "a fee applicant is not entitled to compensation at an attorney's rate simply because an attorney undertook tasks which were mundane, clerical or which did not require the full exercise of an attorney's education and judgment." *Id.* at 1306.

Second, the court "must deduct time spent on discrete and unsuccessful claims." *Id*. at 1302. That is, "[i]f the claims on which the plaintiff did not prevail and the claims on which he did prevail were 'distinctly different claims . . . based on different facts and legal theories,' the court cannot award any fee for services on the unsuccessful claims." *Popham v. City of Kennesaw*, 820 F.2d 1570, 1578 (11th Cir. 1987) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434–35 (1983)). But "if the unsuccessful and the successful claims involve a common core of facts or are based on related legal theories, the court must compare the plaintiff's overall relief with

the number of hours reasonably expended on the litigation." *Id*. (cleaned up). "If the plaintiff obtained excellent results, his attorney should be fully compensated for all time reasonably expended on the litigation." *Id*. (cleaned up). Moreover, "a prevailing party entitled to attorneys' fees is not to be penalized for failed motions." *Eagle Hosp. Phys., LLC v. SRG Consulting, Inc.*, 346 F. App'x 403, 404 (11th Cir. 2009); *see also Columbus Mills, Inc. v. Freeland*, 918 F.2d 1575, 1580 (11th Cir. 1990) (affirming the district court's decision not to reduce attorney's fees for unsuccessful motions).

Mr. McClinton asserts that his counsel spent a total of 666.8 hours in this case. Doc. 178-5 at 32 (asserting a total of 670.5 hours); *see also* Doc. 196 at 18–19 (voluntarily striking 3.7 hours as duplicative). Capstone argues that Mr. McClinton should not be awarded fees for the following categories of hours: (1) "[t]ime spent solely on FMLA claims," which Capstone characterizes as "failed" claims, Doc. 189 at 8 (cleaned up); (2) "[t]ime spent regarding sanctions," *id*. at 10 (cleaned up); (3) "[t]ime spent drafting stricken response to summary judgment motion," *id*. at 11 (cleaned up); (4) "[t]ime spent related to seeking equitable relief," which Capstone characterizes as an "inappropriate request for a windfall," *id*. at 11–12 (cleaned up); (5) "[t]ime spent related to preparing evidence that was never presented at trial," *id*. at 12 (cleaned up); (6) "[t]ime spent related to motions *in limine* that were lost," *id*. at 13 (cleaned up); (7) "time for vague and excessive entries," *id*. (cleaned up); (8)

time spent on "clerical and other non-attorney work," *id*. at 16 (cleaned up). Mr. McClinton challenges all grounds asserted, but voluntarily strikes 3.7 hours as being mistakenly duplicative. *See* Doc. 196 at 18–19.

First, 53.8 hours spent on preparing the stricken summary judgment response, Doc. 189 at 11, and 4.3 hours spent in relation to the sanction imposed on Mr. McClinton's counsel should be excluded.[4] On May 4, 2023, the court publicly reprimanded both Capstone's and Mr. McClinton's counsel. *See* Doc. 108, 109. Capstone's counsel were sanctioned for materially and intentionally misrepresenting the evidentiary record in its brief in support of summary judgment, *see* Doc. 108 at 14, whereas Mr. McClinton's counsel were sanctioned for deliberately violating a court order by filing a summary judgment response that contained alterations clearly prohibited by that order. *See* Doc. 109 at 6. Hours that were spent as a result of counsel's deliberate violation of a court order are not hours reasonably spent.

Second, the 6.3 hours that Mr. McClinton does not contest as being "clerical" in nature should be excluded. *See* Doc. 196 at 17. The same applies to the 0.8 hours that Mr. McClinton does not contest "could be performed by a paralegal." *Id*. (cleaned up).

---

[4] Capstone asserts that Mr. McClinton's counsel's entries for time related to sanctions orders total 7.1 hours. *See* Doc. 189 at 10. Mr. McClinton's reply does not contest that figure but asserts that 2.8 hours were spent drafting and filing a motion for sanctions against Capstone and later filing a reply to Capstone's response. *See* Doc. 196 at 6. The court subtracts 2.8 from 7.1 to arrive at 4.3 as the number of hours Mr. McClinton's counsel spent in relation to sanctions imposed upon themselves.

All other hours, however, are reasonable. Although the jury returned a verdict for Capstone on Mr. McClinton's FMLA retaliation claim, Mr. McClinton was successful on his FMLA interference claim. The two FMLA claims involve a common core of facts and related legal theories. Because of the overall success of Mr. McClinton's claims, deducting the time spent on the FMLA retaliation claim is not warranted. The hours spent related to seeking equitable relief are also reasonable in light of the success of the motion.

The fact that Mr. McClinton was unsuccessful on certain motions *in limine* or prepared evidence that was ultimately not presented at trial does not mean that the hours spent were unnecessary. The entries that Capstone points to as being vague are also not so lacking in substance that they may not be conscionably billed. Accordingly, attorney's fees are awarded in the amount of $210,560.

### 3. Expenses

Mr. McClinton requests $10,852.47 in expenses. *See* Doc. 178-3 at 3. Capstone first argues that Mr. McClinton should not be reimbursed for "round trip mileage and parking for the Court hearing on January 24, 2023, where the Court considered whether to sanction [Mr. McClinton's] counsel." Doc. 189 at 23; *see also* Doc. 178-3 at 2 (Expense No. 16; 17). The court agrees. As with hours spent in relation to the sanction imposed on Mr. McClinton's counsel, expenses related to the sanctions hearing should be excluded as unreasonable.

Capstone objects to Mr. McClinton's request for copying expenses on the basis that he has not provided meaningful descriptions of what was printed or established their necessity. *See* Doc. 189 at 24–26. The court is satisfied, however, by Mr. McClinton's explanation that "trial exhibit binders" as well as copies attributable to "depositions, motions, pleadings, and discovery" were necessary expenses. Doc. 196 at 21-22 (cleaned up). Although copying expenses were not itemized by individual documents printed, five trial binders and "1,586 paper copies" are reasonable numbers for this action. *Id*. at 22. Accordingly, expenses are awarded in the amount of $10,822.71.

## IV. CONCLUSION

For the reasons stated above, Capstone's renewed motion for judgment as a matter of law is **DENIED**. Its motion for a new trial is also **DENIED**. Its motion for a remittitur is **GRANTED IN PART** and **DENIED IN PART**. Mr. McClinton's motion for attorney's fees and expenses is **GRANTED**. Mr. McClinton's motion to alter or amend the final judgment is **GRANTED**.

**DONE** and **ORDERED** this 27th day of March, 2024.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE